**THOMAS & BETTS CORPORATION,**
**Plaintiff,**

v.

**WINCHESTER ELECTRONICS DIVISION OF LITTON SYSTEMS,**
**INC., Defendant.**

Civ. A. No. 78–552.

United States District Court,
D. Delaware.

July 31, 1981.

Harold Pezzner, Connolly, Bove & Lodge, Wilmington, Del., Sidney David, William L. Mentlik, Lerner, David, Littenberg & Samuel, Westfield, N. J., for plaintiff.

Edward M. McNally, Morris, James, Hitchens & Williams, Wilmington, Del., Robert E. Isner, Nims, Howes, Collison & Isner, New York City, Spencer T. Smith, Brian L. Ribando, Hartford, Conn., for defendant.

## OPINION

STAPLETON, District Judge.

Thomas & Betts Corporation ("T & B") charges in this action that the manufacture and sale of products known as "D" subminiature connectors by Litton Systems, Inc., through its Winchester Electronics Division ("Winchester") constitute infringements of Claims 7 through 13 and 15 of T & B's U.S. Patent No. 3,990,767. This patent, issued to Ronald S. Narozny on November 9, 1976, is entitled ELECTRICAL CONTACT AND CONNECTOR MEANS EMPLOYING SAME.

Winchester is a Delaware corporation. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1338(a), and venue is properly laid in this District under 28 U.S.C. § 1391(c) and 1400(d). This Opinion constitutes the Court's findings of fact and conclusions of law after a trial on the merits.

The basic issues presented for decision are:

1. Is the Narozny patent invalid for lack of compliance with 35 U.S.C. § 112?

2. Does the Winchester "single strut" electrical connector construction infringe Narozny patent claims 7–13 and 15 under the "Doctrine of Equivalents"?

3. Are claims 7–13 and 15, in the broadened scope necessary to assert such infringement, valid under 35 U.S.C. § 102 and § 103?

An electrical "connector" is a device for connecting and disconnecting electrical circuits and conventionally consists of an insulating block or housing having a number of electrically isolated electrical contact members mounted in apertures therein with their conductor engaging end portions disposed in parallel spaced relation to permit ready connection and disconnection. One common electrical connector is the conventional electric lap plug which is inserted in a wall socket.

An electrical "contact" is one of the electrical conducting elements maintained within and forming a part of an electrical connector. A contact may consist of an elongated selectively shaped piece of metal having one end portion adapted to be connected to an electrical conductor, such as a wire, and having its other end portion also shaped, as in the nature of a pin or socket, to be separably engaged or connected to another properly located electrical contact element in a mating connector element.

Among the myriad of prior art electrical connectors was one identified as a "D" connector. Each such "D" connector was conventionally formed of an upper and a lower insulating housing section of particular perimetric shape having electrical contact members mounted therein. The particular perimetric configuration permits inter-connection in only one physical orientation.

Since the mating end portions of electrical connector contacts are conventionally parallel, there is a selected "pitch" or spacing between the contact end portions. The "D" connector construction conformed to a particular military specification and, in accord therewith, the mating conductor engaging end portions of the contact element had a pitch or spacing of .0545 inches.

In the early 1970's "flat cable" (assemblages of round wire conductors disposed in parallel uniformly spaced planar relation and encased in a common planar insulating sheath) became widely used. Different types of "flat cable" having varying numbers of wires and varying spacing or pitch between adjacent wires were available. A pitch of .050 inch between adjacent conductors was one commonly employed pitch for flat cable.

In the late 1960's, the concept of "mass termination" (the simultaneous connection of a number of contacts to the round wire electrical conductors of a flat cable) was developed by the Minnesota Mining & Manufacturing corporation. "Mass termination" of flat cable was achieved through the use of electrical connectors incorporating electrical contact elements having one conductor engaging end portion selectively shaped and slotted to receive and displace the insulation surrounding the wire. Such units are known as "IDC" or insulation displacement contacts. Critical to the use of IDC connectors was the precise location of the conductors of the flat cable. The successful commercial realization of this concept was delayed until the early 1970's because of the difficulty in accurately maintaining the precise spacing of the wires within the insulating sheath.

After commercial development of the technique of mass termination of flat cable through the use of IDCs and before 1974, D type connectors were offered in the market which mass terminated flat cable through the use of IDCs. These connectors consisted of an insulated housing with apertures in the bottom and top for the placement of the conductor engaging end portions of a plurality of contacts. The spacing of these apertures was the same on the top and the bottom and, accordingly, the contacts consisted of conductor engaging end portions connected by enter portions that went "straight through" the housing.

In 1974, T & B assigned Narozny the task of designing a "D" type connector that would mass terminate a .050 pitch flat cable as an input and interface a standard "D" configuration on its output side. The assignment was thus to design a connector which would effect a "pitch change." His design efforts were ultimately embodied in a formal "invention disclosure" write-up submitted to T & B's in-house patent de-

partment. This invention disclosure included a two part housing structure and three separate electrical contact structures adapted to effect the necessary lateral offsetting of one of the conductor engaging end portions thereof to effect the required change in pitch from the input to the output side of a connector housing. More specifically:

- "Item 1" is delineated as a "Double Beam Offset Design" in which the central portion of the contact is constituted by a pair of spaced parallel struts. The depiction bears the legend "Two End Elements Remain 90° Regardless The Amount of Offset" (DX128; sheet 4 of 8).

- "Item 2" is delineated as a "Single Beam Offset Design" in which the central portion of the contact is constituted by a single strut or beam (DX128; sheet 4 of 8).

- "Item 3" is delineated as a "Single Beam Offset Design With End Elements Shifting Parallel To Stock Thickness" and in which the central portion of the contact is constituted by a single strut or beam (DX128; sheet 2 of 8).

---

The Narozny patent drawings and specifications illustrate and describe an electrical contact structure having a central portion in the form of a pair of spaced parallel struts disposed between the conductor engaging end portions. Insofar as the central portion of the contact member is concerned, all of the Narozny claims conform in scope to that of the drawings and descriptive text, i. e., a central portion constituted by "a pair of spaced parallel struts. . . . .".

No significant changes were made in either the specification or claims during the Patent Office prosecution. Claims 7–13 and 15 here in issue, were allowed in the first Office Action.

With respect to the claims in issue, claim 7 is the only one that is of so-called "independent" character, and hence, if claim 7 is not infringed, then one of the dependent claims 8–13 and 15 cannot be infringed.

The parties are in agreement that claim 7 can be divided into twelve segments:

"7. An electrical connecting device comprising"

[1] an elongate contact housing having an upper portion and a lower portion;

[2] there being a series of first transverse apertures extending through said upper portion of said contact housing and aligned along a first common axis;

[3] there being a series of second transverse apertures extending through said lower portion of said contact housing and aligned along a second common axis, said first common axis and said second common axis extending generally parallel to on another;

[4] said series of first transverse apertures being spaced from one another a first given distance;

[5] said series of second transverse apertures being spaced from one a second given distance different than said first given distance;

[6] each aperture of said series of first transverse apertures being selectively aligned with a corresponding aperture of said series of second transverse apertures along a predetermined axis and thereby defining a series of pairs of apertures;

[7] and a series of electrical contacts, one for each of said pairs of apertures;

[8] each of said contacts comprising an elongate member having a first conductor engaging end portion;

[9] a second conductor engaging end portion and a central portion connecting said first end portion to said second end portion;

[10] said central portion comprising a pair of spaced parallel struts each terminating in end portions rigidly affixed to a respective one of said conductor engaging end portions and bendable thereat in a preferred direction within a common plane so that said first conductor engaging end portion and said second conductor engaging end portion may be selectively axially offset from one another in a direction parallel to said common plane;

[11] each of said contacts being disposed between a corresponding one of said pairs of apertures in said contact housing so that said first conductor engaging end portion extends within a corresponding one of said first transverse apertures and said second conductor engaging end portion extends within a corresponding one of said second transverse apertures, said central portion of said contact being aligned with said predetermined axis;

[12] whereby said first conductor engaging end portions of said contacts are spaced from one another said first given distance, and said second conductor engaging end portions of said contacts are spaced from one another said second given distance so that said first conductor engaging end portions may be connected to conductive elements having a spacing therebetween generally equal to said first given distance, and said second conductor engaging end portions may be connected to conductive elements having a spacing therebetween generally equal to said second given distance."

The structure claimed in claim 7 is best illustrated by Figure 6:

## FIG. 6

T & B introduced the Narozny "D" connector in the marketplace in mid-1976. Shortly thereafter, Winchester acquired a T & B Narozny connector and designed a virtually identical pitch change connector, which it now concedes to be an infringing device. In May of 1977, Winchester's chief engineer, Robert Knowles, sent a letter to defendant's patent counsel stating:

As you can see, there is a great similarity between our approach to the centerline shrinking connector and Ansleys. The only major differences is that we use the square box and Ansley uses the tulip.[1] As you can guess, our charter is to make our connector interchangeable and intermateable with Ansley anywhere possible.[2]

1. The terms "square box" and "tulip" refer to the configuration of the upper insulation-displacing portion of the contacts which is agreed by both sides to be "old art."

2. Although in PX 64, Mr. Knowles asks Mr. Carpenter to check out any potential patent

Subsequent to the institution of the present action and in direct response thereto, Winchester modified the design of its "D" pitch change connector. In so doing, however, it made only one modification. It eliminated one of the two parallel struts from the bendable central region of the contacts, thereby literally avoiding the language of the patent claims which calls for a pair of parallel struts.

Plaintiff's Exhibit 28(a), reproduced below, is a drawing prepared by Winchester, itself to illustrate the modification of the original contract structure:

problems, no opinion from Mr. Carpenter was ever forthcoming in response to that request. If a patent search had been conducted at that time in May of 1977, T & B's Narozny patent would have been uncovered.

OFFENDING LEG REMOVED —

"L" SECTION ADDED FOR CONDUCTIVITY —

This drawing, which shows the eliminated strut in phantom lines and includes Winchester's characterization, "offending leg removed," was sent by it to a British licensee with a letter stating as follows:

I am enclosing a print of the new 'D' subminiature contact which will replace the one alleged to infringe on the Ansley patent.

We do not feel that this change will be in anyway detrimental to the function of the contact in its end use.

### I. THE SECTION 112 ISSUE.

35 U.S.C. § 112, provides, in the first paragraph, that:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

■ The best mode requirement is fixed as of the time the patent application is filed. Its purpose is to restrain applicants from applying for patents while concealing from the public the preferred embodiments which they have, in fact, conceived. *National Research Development Corporation v. Great Lakes Carbon Corp.*, 410 F.Supp. 1108, 1122 (D.Del.1975).

Winchester maintains that the preferred embodiment of the Narozny connector at the time the application was filed was the one shown in his original invention disclosure and the one in fact utilized by T & B in the connector which it marketed. As disclosed by Narozny and as manufactured by T & B, the prebent contacts are mounted or fitted on a "T" shaped housing insert and the assemblage of insert and contacts is then inserted into the base housing. The insert and the base housing together function to define the upper "apertures" and thus to locate and maintain the contacts within the housing. In contradistinction, the patent drawings show only an integral or unitary structure for the connector housing.

■ The record is virtually barren of evidence bearing on the issue of whether T & B considered the "T" insert housing design to be preferable to the housing design disclosed in the patent at the time of the filing of the application and I am unpersuaded that it did. I find it more likely that each

design was within a field of numerous approaches well known in the field of connector housing design and that the selection of the particular housing design to be shown in the drawings of the patent was not considered to be significant at the time. Clearly the selection was not intended to reserve the "best mode" for T & B. If it had in fact decided to go the "T" insert route as early as the time of filing, T & B surely would have realized that the imminent release of its commercial embodiment in the marketplace would quickly advise potential competitors that this approach was a feasible one.

## II. THE EQUIVALENTS ISSUE

As earlier noted, Winchester's single strut connector does not literally infringe the Narozny patent. T & B maintains, however, that it performs substantially the same function in substantially the same way to obtain this same result as the patented device, thus constituting an infringement of the Narozny patent by application of the doctrine of equivalents. *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed.2d 1097 (1950); *Funnelcap, Inc. v. Orion Industries, Inc.,* 421 F.Supp. 700 (D.Del.1976); *Clopay Corporation v. Blessings Corporation,* 422 F.Supp. 1312 (D.Del.1976); *Tokyo Shibaura Electric Co., Ltd. v. Zenith Radio Corporation,* 404 F.Supp. 547 (D.Del.1975) *aff'd* 548 F.2d 88 (3d Cir. 1977). I agree.

To briefly summarize the evidence, in addition to PX 28, in which Winchester acknowledges the equivalence of its single strut contact connector to its original double strut version and that the change from a double strut to the single strut contact was of no particular consequence to the overall functioning of the connector, Winchester's Mr. Knowles testified that: (1) no changes were made to the connector housing as a result of the change in the contact construction; (2) just like the double strut contacts, all of the single strut contacts are

of identical design and, like the double strut contacts, are made in a continuous basis and severed in accordance with a number of contacts required in the connector housing; (3) just like the double strut version, the degree of bending in the single strut version is a function of the number and spacing of the apertures of the housing, and the degree of lateral offset increases as the contacts progress outwardly from the central line of the housing; (4) in the connectors employing the single strut contacts, the contact engaging end portions end up parallel to each other, the same as in the case of the double strut version; (5) both the double strut contacts and the single strut contacts are capable of being interchangeably used in the connector bodies; (6) no announcement of any kind was made to the public at large with regard to the design change in the contact; and (7) the central portions of the single strut contacts are admittedly bendable and offsettable as the central portions were in the original double strut version. Indeed, Mr. Knowles testified quite unequivocally that no function performed by the old double strut contact is not also performed by the new single strut contact.

Winchester nevertheless argues that the single strut and double strut contacts are functionally different because (1) the single strut contact configuration is allegedly "functionally incapable of automatically maintaining the conductor engaging end portions of the contact element in parallel aligned relation during lateral offsetting," and (2) the double strut contact element, from an electrical standpoint, comprises a "parallel" circuit while the single strut configuration comprises a "series" circuit.

With respect to Winchester's first argument, I conclude that it misreads claim 7. The operative language of claim 7 requires only that the contact structure be such that the conductor engaging end portions "may be selectively axially offset from one another." [3] There is nothing in claim 7 which

---

**3.** Clause 10 of claim 7 provides:

said central portion comprising a pair of spaced parallel struts each terminating in end portions rigidly affixed to a respective one of said conductor engaging end portions and

bendable thereat in a preferred direction within a common plane so that said first conductor engaging end portion and *said second conductor end portion may be selec-*

requires that the contact end portions be maintained parallel to one another during lateral offsetting (i. e., during bending), and surely there is nothing in claim 7 which requires, as Winchester contends, that they be "automatically" so maintained by virtue of the contact structure employed.[4] To the extend that any claim discussed the capability of the contact itself to automatically maintain the parallel orientation of the contact end portions during bending and offsetting, it is not until dependent claim 11 that such a feature first appears.[5]

Comparing claim 7 to claim 11, it can be seen that claim 7 is broader than claim 11 and does not include as a limitation on the invention the very feature which Winchester would have the Court believe is the "essence" of the invention. Since the law is clear that it is improper to construe a broad claim as if it contains a limitation expressed in a narrower claim, *Crane Company v. Aeroquip Corporation*, 504 F.2d 1086 (7th Cir. 1974), it follows automatic maintenance of the parallel alignment of end portions is not a part of the invention claimed in claim 7 and that the alleged inability of the single strut configuration to maintain that relationship does not preclude application of the doctrine of equivalents to claim 7.[6]

Finally, although the single strut contact, technically speaking, operates as a "series" circuit and the double strut contact operates as a "parallel" circuit, they both serve to provide the desired millivolt drop from one end of the contact to the other. Specifically, although Mr. Knowles indicated that, in fact, the single strut contact exhibits a higher millivolt drop which is a disadvantage under certain circumstances, he testified that for purposes of the overall functioning of the connector, the particular current carrying capability of the single strut connector would be within the same range of acceptability as in the case of the original double strut version. Thus, contrary to Winchester's contention, the connectors are fully equivalent to one another in terms of current carrying capability.

■ For these reasons, I conclude that the accused connector performs substantially the same function in substantially the same way to obtain the same result as the invention claimed in Claim 7.

## III. THE SECTION 102 AND SECTION 103 ISSUES.

■ Both sides agree that the doctrine of equivalents may not be invoked to support an infringement claim where the effect of its application would be to extend the scope of the claim allegedly infringed to encompass prior art. They recognize that to hold otherwise would obviously be to preclude a defendant from practicing the teachings of the prior art. The parties are in fundamental disagreement, however, as to whether

---

tively axially offset from one another in a direction parallel to said common plane. (Emphasis supplied).

4. The function of having the contact end portions selectively and axially offsettable from one another as recited in claim 7 is, of course, achievable by both a single strut and double strut contact element (PX 55, Knowles Dep., p. 127):

> Q—And that the central portion of the new contacts . . . are bendable and offsettable in the same manner that the old central portions were in the old contacts?
> A—That's right.

Moreover, in both the Winchester structure and the structure claimed in claim 7 of the patent-in-suit, the housing apertures maintain the contact ends in parallel and axially offset relationships.

5. Claim 11 provides:

> An electrical connecting device as defined in claim 7 wherein said struts of said electrical contact generally define a parallelogram after bending so that the original axial orientation of each of said first and said second conductor engaging end portions *is maintained irrespective of the degree of axial offset therebetween.*

(Emphasis supplied).

6. Contrary to T & B's contention, I do not see how the single strut Winchester connector can be said to infringe claim 11 under the doctrine of equivalents or otherwise.

the Narozny patent, if construed to claim a single strut design like that of Winchester,[7] would violate Section 102 or Section 103 of the statute. I conclude that it would not violate Section 102, but that it would violate Section 103.

### A. The Anticipation Issue.

■ Winchester asserts that the Narozny patent is anticipated by the prior art. To succeed with this argument, it must establish that all elements of the claimed invention, except for insignificant differences, are disclosed in a single prior art reference. It has not done so.

The prior art cited by Winchester in connection with its anticipation argument is U.S. Patent No. 3,816,819 issued to Judd; U.S. Patent No. 3,912,983 issued to Lowry; and certain devices referred to as the Burndy references.

In Lowry, the channels in which the contacts are situated do not constitute apertures as is required in clauses 2–6 of claim 7 of the Narozny patent. More significantly, however, clause 10 of claim 7 of the Narozny patent is not met by Lowry in that each contact of Lowry does not include opposing end portions which are joined by a *bendable* central portion constructed to permit the end portions of the contact to be selectively offset from one another in a direction parallel to the common plane so as to effectuate a pitch change in that common plane.[8]

With respect to the Burndy devices, Winchester did establish that Burndy manufactured and sold to Univac prior to 1965 an electrical connector which is depicted in defendant's exhibits 103 and 104.[9] The contacts depicted on the Burndy connector drawings, however, are stamped to form their fixed offset and, accordingly, are not bendable at the junctures of the central

portion and conductor engaging ends so that those ends may be selectively offset from one another to the extent desired.

Finally, as Winchester's own expert conceded, the Judd connector does not meet the requirements of clause 12 of claim 7. Moreover, the Judd contacts may not be selectively offset from one another in a direction parallel to the common plane as stipulated in clause 10.

### B. The Obviousness Issue.

The starting point for any analysis of a Section 103 issue is, of course, *Graham v. John Deere*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966):

> . . . Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or non-obviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

This record reflects that the level of ordinary skill in the art of connector design was quite high in the 70's. Firms competing in this market tended to utilize design groups headed by graduate mechanical engineers. Moreover, the art had been in existence for many years and the typical connector designer was an experienced artisan.

A comparison of the Narozny patent with the prior art is best initiated by another reference to the twelve clauses of claim 7.

---

7. Winchester does not contend that any of the Narozny patent claims are invalid under Sections 102 or 103 if effect be given to the limitation concerning a contact center portions constituting "a pair of parallel struts." I, accordingly, express no opinion on those issues.

8. The same is true of U.S. Patent No. 3,731,254 to Key, also mentioned by Winchester.

9. Both Damiano and Knowles so testified and I see no reason to doubt their word about the matter.

It is undisputable that all clauses save two are satisfied by the prior art D connectors which did not effect a pitch change. These connectors are exemplified by U.S. Patent No. 3,820,058 issued to Friend (DX 46), and by the connector marked at trial as PX 47. Thus, for example, there was clearly nothing new about the housing of the Narozny connector, the provision for a plurality of contacts having conductor engaging end portions connected by a "central portion", the means utilized at either end for engaging the conductors, or the concept of a spaced series of paired, parallel apertures to position the contacts. The only differences between claim 7, read to cover a connector with single strut contacts, and the standard non-pitch change, prior art D connectors are that in the claim 7 connector (1) the spacing of the second series of apertures in the lower portion of the housing differs from the spacing of the first series of apertures in the upper portion of the housing so that the paired apertures are offset and (2) the end portions in the offset apertures are connected by a contact center portion which is bendable at the point of connection.

Thus, the question for decision is whether one of ordinary skill in the art of connector design in the mid-1970's, when confronted with the problem of connecting two sets of conductors having different pitches, would have found it obvious to offset the paired apertures and to adjust for that offset by utilizing contacts with bendable center portions. I conclude that the answer must be in the affirmative.

As T & B's own witnesses candidly acknowledged, the spacing of the apertures on the top and bottom of a connector is dictated by the pitch of the incoming and outcoming conductors and will, of necessity, be different if those pitches are different. Accordingly, when Narozny was handed a prior art D connector, as he was, and assigned the task of designing a connector which would connect .050 pitch flat cable with something having a .545 contact end spacing, the assignment itself required a difference in spacing between the apertures on the bottom and top of the connector. This fact is evident from the following testimony of T & B's expert, Mr. Shields:

Q ... Let's suppose I have a piece of cable which you said was standard of 050 space centers, 054 whatever you call it. I want to hook an 050 set of cable to an 054 set of cable.

A Yes.

\* \* \* \* \* \*

Q Your dimensional parameters are all set in that environment, aren't they? You know you've got to go from 050 to 054.

A Yes, that's correct, you do.

Q Right. And if you were designing an insulating housing on this side, you know you have apertures on one side of it at 050 and the other side on 054, wouldn't you, just be definition?

A That would be what you would have to accomplish, yes.

Q And those apertures then determine the incoming pitch and outcoming pitch that you're going to come up with.

A Yes, that's correct.

\* \* \* \* \* \*

(A. 104–105)

Q What was the instructions given to [Narozny]? What was he told to design?

A The criteria that Mr. Narozny was guided by was a criteria that was generated by the Marketing Department and coordinated with and approved by the Engineering Department.

Q What was the criteria? To go from 050 spacing to 054?

A The criteria was to use the standard 050 pitch cable with the installation displacement contacts and interface or mate with the standard "D" Connectors.

Q Now, do I take it from that what you have said that the standard 050 cable with the IDC ends was quite commin in your standard line of. conductors at that time?

A  All the rest of the line had it.

Q  For a couple of years?

A  Two years, all right.

Q  He was to take that approach and modify it to come out with 054 spacing on the other end of the contact, assembly, whatever you want—Is that it?

A  That would be the interpretation that I would make. If it mates with another connector that would have that face, it would have to do it that way. There may be another way to do it.

Q  He was told that it was he was to do.

A  He was to mate it on the other end, yes.

(A. 110–111).

Further, T & B acknowledged in its brief that "it's old to put bends in a piece of metal to get an offset contact," [10] and I believe this approach to joining the offset conductor engaging end portions would undoubtedly be one which an artisan in 1974 would have considered. The Judd patent is a good example of how earlier artisans had used a bendable center portion of a contact in an electrical connector to effect a pitch change. That patent describes a pitch change electrical connector in the form of a plug which connects lamp wire to a branch wiring system at a wall receptacle. While as earlier indicated, this patent does not literally read on a Winchester type connector, it does clearly teach the use of bendable contacts to effect a pitch change and it would be obvious to one skilled in the art to utilize that teaching in adapting the prior art D connector for use with conductors having a different pitch.

As earlier intimated, T & B does not contend that the use of a bendable contact to effect an offset in a connector was new with Narozny. Rather it claims that "what was new . . . was the combination of a plurality of identical contacts each having a bendable central region, . . . and an appropriately apertured connector housing" so as to effect a pitch change.[11] The prior art, nonpitch change D connectors, however, had a plurality of identical contacts each having a central region encased in an apertured connector housing. To be sure, it was appropriately apertured for connecting sets of wires having the same pitch and, accordingly, had no need for bendable center portions. But given the problem of providing a connecting means of wires having different pitches, I believe it would have occurred to the skilled artisan to combine the concept of the prior art D connector with the concept of using bendable contacts to effect the necessary offset in order to produce a Winchester type connector. In doing so, there would, of course, be no reason to abandon the advantages of using a plurality of identical contacts.

It is true, as T & B stresses, that the Narozny connector has been a significant commercial success. Sales of both the T & B connector and the Winchester connector have risen steadily since their respective introduction. This is attributable in part to an expanding market for connectors in today's computer age which has caused sales of all of T & B's connectors to increase sharply in the last five years. It is also attributable to the fact that the Narozny connector meets a significant need in an efficient manner. That a device be useful or even better than earlier solutions is not enough, however. As the Court of Appeals for the Third Circuit recently put it, to be non-obvious a change from the prior art, even though productive of "better results", must be "the creation of an inventive faculty", rather than a product of "the sort of useful intelligence that any 'skilled mechanic' would . . . [be] called upon to exert daily in the course of exercising his skill." *North Engineering and Plastics Corp. v. Roger Eddy*, 652 F.2d 333, 339 (1981).

In concluding that the combination of elements found in the Winchester connector is one which would have been obvious to a person of normal skill in the art, I am not unmindful of the deference due to the con-

---

**10.**  T & B's Response Brief p. 44.

**11.**  T & B Response Brief p. 8.

clusions reached by the Patent & Trademark Office. The normal presumption of the validity of an issued patent is attenuated in the current context of the facts (1) that the examiner addressed himself only to the patentability of a double strut contact connector and (2) that the prior art cited to him did not show a bendable contact utilized to effect a pitch change.[12]

### CONCLUSION

█ Winchester does not challenge the validity of the patent-in-suit and tacitly concedes that its original double strut connector infringes that patent. That connector was copied from T & B's Narozny connector and Winchester knew, or certainly should have known, that its manufacture and sale would constitute infringement. An evidentiary hearing on the relief to be accorded as a result of this infringement will be scheduled promptly.

█ The Winchester single strut structure does not fall within the literal scope of the claims of the Narozny patent, however, and the doctrine of equivalents is inapplicable because that structure was obvious at the time of the Narozny invention and, accordingly, in the public domain at that time. Relief will be denied with respect to Winchester's single strut connector.

---

12. The evidence of obviousness is sufficiently compelling, however, that the result would not be different if the patent-in-suit were accorded the customary presumption of validity.