THOMAS & BETTS CORPORATION,
Appellant,

v.

LITTON SYSTEMS, INC., Appellee.

Appeal No. 83–537.

United States Court of Appeals,
Federal Circuit.

Nov. 14, 1983.

Sidney David, Westfield, N.J., argued for appellant. With him on the brief was William L. Mentlik, Westfield, N.J., Connolly, Bove & Lodge, Wilmington, Del., of counsel.

Robert E. Isner, New York City, argued for appellee. With him on the brief was Christopher B. Garvey, Yonkers, N.Y., Spencer T. Smith and Brian L. Ribando, Hartford, Conn., of counsel.

Edward M. McNally, Wilmington, Del., of counsel.

Before MILLER, Circuit Judge, SKELTON, Senior Circuit Judge, and SMITH, Circuit Judge.

JACK R. MILLER, Circuit Judge.

Thomas & Betts Corporation ("T & B") appeals from the decision of the United States District Court for the District of Delaware that T & B's U.S. Patent No. 3,990,767 ("the Narozny patent"), issued November 9, 1976, for an "Electrical Contact and Connector Means Employing Same," has not been infringed by the manufacture and sale by Litton Systems, Inc., Winchester Electronics Division ("Winchester"), of a "single strut" electrical connector construction. We reverse and remand.

## BACKGROUND

In the early 1960's, a multi-conductor flat cable having a plurality of uniformly spaced conductors sandwiched between layers of insulation was developed. This became widely used during the 1970's. Flat cable commonly employs a pitch (spacing between adjacent conductors) of .050 inch. However, the mating end portions of standard "D" type electrical connectors (used to connect and disconnect electrical circuits) have parallel electrical contacts spaced .0545 inch apart.

In 1974, T & B asked its inventor to design a "D" type connector which would receive flat cable having a pitch of .050, but which would produce a standard "D" configuration having a .0545 pitch on its output side. T & B's inventor submitted an invention disclosure relating to an electrical connector having an upper portion (for input), a lower portion (for output), and a bendable central portion to effect the desired pitch change from input to output, all within a housing with suitably offset apertures to accommodate the upper and lower portions at different pitches. According to this disclosure, the bendable central portion of the connecting electrical contact could comprise either a pair of spaced parallel struts or a single strut. However, as filed on July 11, 1975, T & B's patent application (claims, drawings, and text) disclosed a central portion comprising only "a pair of spaced parallel struts." No significant changes were made in the specification or claims during prosecution before the U.S. Patent and Trademark Office ("PTO").

Shortly after introduction of T & B's connector in the marketplace (mid-1976), Winchester designed a virtually identical pitch change connector. In response to the institution of suit by T & B for infringement of claims 7 through 13 and 15 of the Narozny patent, Winchester modified the design of its "D" pitch change connector to eliminate one of the two parallel struts from the bendable central region of the contacts. Winchester stated in a letter to its British licensee that it did "not feel that this change will be in anyway [sic] detrimental to the function of the contact in its end use." Enclosed with the letter was a drawing prepared by Winchester, reproduced below, to illustrate the modification of the original electrical contact structure.

OFFENDING LEG
REMOVED —

"L" SECTION ADDED
FOR CONDUCTIVITY —

In the ensuing litigation, Winchester contended that the Narozny patent was invalid for failure to comply with 35 U.S.C. § 112 (but did not assert invalidity in view of the prior art); admitted infringement of the claims in question by its double strut connector; urged that its single strut connector did not infringe the claims in question under the doctrine of equivalents; and argued that the claims, if read in the broadened scope necessary for infringement, would be invalid under 35 U.S.C. §§ 102 and 103.

In an opinion dated July 31, 1981,[1] the trial court held that the claims in suit met

1. Published at 519 F.Supp. 1191, 213 USPQ 943.

the best mode requirement of 35 U.S.C. § 112 and, therefore, were valid. Further, the court found that T & B's double strut connector and Winchester's single strut connector performed substantially the same function in substantially the same way to obtain the same result and, therefore, were "fully equivalent" structures. However, the court refused to apply the doctrine of equivalents to support T & B's infringement claim because the effect "would be to extend the scope of the claim allegedly infringed to encompass prior art." 519 F.Supp. at 1199, 213 USPQ at 948. The court held that claim 7 (the only independent claim in suit) was not anticipated under 35 U.S.C. § 102 by U.S. Patent No. 3,816,819 ("Judd"), U.S. Patent No. 3,912,-983 ("Lowry"), U.S. Patent No. 3,731,254 ("Key"), or by a "Burndy device," but that it would have been obvious to the skilled artisan, under 35 U.S.C. § 103, to combine the concept of the prior art "D" connector with the concept of using a bendable, single strut contact, disclosed by the Judd patent, to effect the necessary offset. Concerning the Judd patent, the court stated:

> While as earlier indicated, this patent does not literally read on a Winchester type connector, it does clearly teach the use of bendable contacts to effect a pitch change . . . .

519 F.Supp. at 1202, 213 USPQ 950.

The court also attributed the commercial success T & B had achieved with its connector to the generally expanding market for electrical connectors in today's computer age, as evidenced by a sharp increase in the sales of all of T & B's connectors in the last five years.

*The Narozny Patent*

The Narozny patent discloses an electrical connector which is capable of terminating

to standard .050 inch pitch, flat cable at one end and, at the other end, is capable of interfacing with systems requiring a standard "D" connector. Figure 6 of the Narozny patent perhaps most clearly illustrates the nature of the patented invention:

*FIG. 6*

The claimed electrical connector of the Narozny patent includes:[2]

1. a housing consisting of:

   a. an upper portion 68 having a first set of apertures, designated 82, spaced a distance (A) apart; and

   b. a lower portion 70 having a second series of apertures, designated 84, spaced a different distance (B) apart; and

2. contacts 20 connecting the upper and lower series of apertures having:

   a. upper conductor end portions 22;

   b. bendable central regions "each comprising a pair of spaced parallel struts" 26; and

---

2. Claim 7 is illustrative and is set forth with bracketed numbers for the individual clauses to assist the reader.

"7. An electrical connecting device comprising:

■ an elongate contact housing having an upper portion and a lower portion;

■ there being a series of first transverse apertures extending through said upper portion of said contact housing and aligned along a first common axis;

■ there being a series of second transverse apertures extending through said lower portion of said contact housing and aligned along a second common axis, said first common axis and said second common axis extending generally parallel to one another,

■ said series of first transverse apertures being spaced from one another a first given distance,

■ said series of second transverse apertures being spaced from one another a second given distance different than said first given distance,

■ each aperture of said series of first transverse apertures being selectively aligned with a corresponding aperture of said series of second transverse apertures along a predetermined axis and thereby defining a series of pairs of apertures;

c. lower conductor engaging end portions 24.

## The Prior Art

Prior art "D" connectors which do not effect a pitch change are exemplified by U.S. Patent No. 3,820,058 ("Friend") which discloses a pierce type connector block 10 for forming electrical connections with insulated conductors in ribbon cable 26, as illustrated below.[3]

■ and a series of electrical contacts, one for each of said pairs of apertures,

■ each of said contacts comprising an elongate member having a first conductor engaging end portion,

■ a second conductor engaging end portion, and a central portion connecting said first end portion to said second end portion,

■ said central portion comprising a pair of spaced parallel struts each terminating in end portions rigidly affixed to a respective one of said conductor engaging end portions and bendable thereat in a preferred direction within a common plane so that said first conductor engaging end portion and said second conductor engaging end portion may be selectively axially offset from one another in a direction parallel to said common plane,

■ each of said contacts being disposed between a corresponding one of said pairs of apertures in said contact housing so that said first conductor engaging end portion extends within a corresponding one of said first transverse apertures and said second conductor engaging end portion extends within a corresponding one of said second transverse apertures, said central portion of said contact being aligned with said predetermined axis,

■ whereby said first conductor engaging end portions of said contacts are spaced from one another said first given distance, and said second conductor engaging end portions of said contacts are spaced from one another said second given distance so that said first conductor engaging end portions may be connected to conductivity elements having a spacing therebetween generally equal to said first given distance, and said second conductor engaging end portions may be connected to conductive elements having a spacing therebetween generally equal to said second given distance."

3. Extraneous numbers have been removed from this and subsequent drawings for clarification.

The connector block of Friend includes a housing 16, a plurality of contacts 30 having conductor engaging end portions 32 and 34 connected by a straight central portion, and a spaced series of paired, parallel apertures to position the contacts 18.

The Judd patent discloses a household plug capable of receiving and making electrical contact with an insulated wire, such as lamp wire, in order to connect it to the electrical outlet of a wall receptacle, as illustrated below:

Extending from the lower part of the insulating housing 10 are a pair of parallel power blades 20 and 22. An insulated wire 28 having two parallel conductors 30 is inserted through a wire entry port at one end of the housing and is positioned above two insulation-piercing "contacts" 21 and 23 formed as an integral part of the inner ends of the power blades 20 and 22. The driving

end 48 of a cam presses the insulated wire 28 into contact with the insulation-piercing "contacts" 21 and 23 and causes the "contacts" to penetrate through the insulating sheath of the wire.

Lowry discloses a plurality of contact members 40, each of which is permanently shaped to effect a pitch change and is situated within one of a set of grooves formed in a recessed plate 38.

Key discloses a device for interconnecting flat multi-conductor cable with connectors accommodated in standard dual-inline sockets used in integrated circuit panel boards. The Key connector 22 comprises a housing including a base 50, upper cover structure

52, and terminals 51. Each terminal is stamped from metal and then permanently bent into an L-shaped configuration. The terminal post portions 73 extend through apertures 63 in the base 50. The integral contact portions 74 are disposed along the

upper surface of the base with the transverse spacing between each one corresponding to the pitch of the flat multi-conductor cable 21, as illustrated below:

The "Burndy device" was manufactured by Burndy and sold to Univac prior to 1965. We agree with the trial court's characterization of "[t]he contacts depicted on the Burndy connector drawings" as "stamped to form their fixed offset and, accordingly, ... not bendable at the junctures of the central portion and conductor engaging ends ...." 519 F.Supp. at 1200, 213 USPQ at 949.

## ISSUES

The issues in this appeal are two-fold: (1) Did the district court clearly err in finding that Winchester's "single strut" electrical

connector is equivalent to T & B's claimed "double strut" electrical connector? (2) Did the district court err in refusing to apply the doctrine of equivalents to support T & B's infringement claim on the ground that claims 7 through 13 and 15 of the Narozny patent, in the broadened scope necessary to support a finding of infringement, would read on the prior art?

## OPINION

### Doctrine of Equivalents

■ In the seminal case on the doctrine of equivalents, *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097, 85 USPQ 328 (1950), the Supreme Court recognized that "to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing." *Id.* at 607, 70 S.Ct. at 856, 85 USPQ at 330. A finding of equivalence, namely, that a device performs substantially the same function in substantially the same way to obtain the same result, is a determination of fact. *Id.* at 609, 70 S.Ct. at 856–57, 85 USPQ at 331. Accordingly, the trial court's finding of equivalence must be affirmed unless it can be shown to be clearly erroneous.

■ Winchester appears to argue that the doctrine of equivalents is not applicable unless the patentee's specification itself expressly discloses the equivalent element and the fact that it is a proper substitute,[4] citing Justice Black's dissent in *Graver Tank*. However, the majority opinion in that case quite clearly states:

> What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case.... An impor-

tant factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was.

*Id.* at 609, 70 S.Ct. at 856–57, 85 USPQ at 330–31. In other words, the test of equivalency extends beyond what is literally stated in a patentee's specification to be equivalent and encompasses *any* element which one of ordinary skill in the art would perceive as interchangeable with the claimed element. If a patentee were bound by the literal language of his specification and claims, the purpose of the doctrine of equivalents, to give relief against the copier who merely makes insubstantial substitutions in a claimed invention, would be frustrated. Thus, the proposition that the claims, taken in view of the specification, measure the metes and bounds of the invention has been realistically tempered by the judicially-formulated doctrine of equivalents.

■ However, application of the doctrine of equivalents may be limited by prosecution history estoppel, which precludes a patentee from obtaining a claim construction that would resurrect subject matter surrendered during prosecution of his patent application. *Hughes Aircraft Co. v. United States,* 717 F.2d 1351 at 1362 (Fed. Cir.1983). Thus, it limits a patentee's reliance on the doctrine of equivalents by preventing him from contending later in an infringement action that his claims should be interpreted as if limitations added by amendment were not present or that claims abandoned are still present. *Square Liner 360°, Inc. v. Chisum,* 691 F.2d 362, 370, 216 USPQ 666, 671–72 (8th Cir.1982). Further, when a patentee relies upon the doctrine of equivalents in an infringement suit to extend the scope of his claims, he opens the door to rebuttal based upon prior representations made by him to the PTO which

---

**4.** Winchester, the appellee, has not filed a cross-appeal to question the trial court's finding of equivalence. Because we conclude that Winchester's argument is without merit and does not affect the result here, we do not de-

cide whether future litigants will be required to file a cross-appeal in order to successfully contest a finding of fact on this issue, as urged by T & B.

appear in the file history. *Coleco Industries, Inc. v. International Trade Commission,* 573 F.2d 1247, 1258, 197 USPQ 472, 480 (CCPA 1978); *Interdent Corporation v. United States,* 531 F.2d 547, 552, 187 USPQ 523, 526 (Ct.Cl.1975).

■ Also, it is to be noted that, while a pioneer invention is entitled to a broad range application of the doctrine of equivalents, an invention representing only a modest advance over the prior art is given a more restricted (narrower range) application of the doctrine. When a patentee claims an improvement over an earlier invention, other parties are entitled to practice variations of that prior invention, so long as they are not the same as, or an equivalent of, the improvement claimed by the patentee. *Sealed Air Corp. v. U.S. International Trade Commission,* 645 F.2d 976, 984–85, 209 USPQ 469, 477 (Cust. & Pat.App.1981).

Because T & B's patent is not a pioneer patent, having issued in the crowded art of electrical connectors as an improvement over a prior standard "D" connector, the claims should be given a range of equivalents narrow enough to distinguish over the prior art and, thus, to avoid invalidity. *Dominion Magnesium Ltd. v. United States,* 320 F.2d 388, 394, 138 USPQ 306, 310 (Ct.Cl. 1963); *Pratt & Whitney Co. v. United States,* 345 F.2d 838, 841, 145 USPQ 429, 431 (Ct.Cl.1965).

■ However, although the effect of the prior art on the scope of the claims in suit is to be considered, our approach should not be a "camouflaged or back-handed attack" on the validity of the Narozny patent. *Bendix Corp. v. United States,* 600 F.2d 1364, 1373, 204 USPQ 617, 624 (Ct.Cl.1979). Where validity in view of the prior art has not been challenged, the court is less free to limit the application of the doctrine of equivalents than where invalidity is specifically urged by the alleged infringer. *Id.* at 1374, 204 USPQ at 624.

*Validity of the Claims if Construed Sufficiently Broadly to Encompass Winchester's "Single Strut" Connector*

■ T & B alleges that the trial court improperly relied on unpublished internal criteria generated by T & B's Marketing and Engineering Departments ("M & E criteria")[5] as prior art in finding that "the assignment itself required a difference in spacing between the apertures on the bottom and top of the connector." However, what the court did was to find that the offsetting of paired apertures between the upper and lower portion of the connector housing was not taught by the prior art straight "D" connector; it then used the M & E criteria as evidence of the fact that accomplishing a pitch change by means of offsetting paired apertures would have been within the knowledge of one of ordi-

---

**5.** The M & E criteria were described by the following testimony of T & B's expert, Mr. Shields:

Q Now, did you give Mr. Narozny the specifications for the job that he was to do when he was given this assignment?
A No, I did not.
Q What was the instructions given to him? What was he told to design?
A The criteria that Mr. Narozny was guided by was a criteria that was generated by the Marketing Department and coordinated with and approved by the Engineering Department.
Q What was the criteria? To go from 050 spacing to 054?
A The criteria was to use the standard 050 pitch cable with the installation displacement contacts and interface or mate with the standard "D" Connectors.

Q Now, do I take it from what you have said that the standard 050 cable with the IDC ends was quite common in your standard line of conductors at that time?
A All the rest of the line had it.
Q For a couple of years?
A Two years, all right.
Q He was to take that approach and modify it to come out with 054 spacing on the other end of the contact, assembly, whatever you want—Is that it?
A That would be the interpretation that I would make. If it mates with another connector that would have that face, it would have to do it that way. There may be another way to do it.
Q He was told that is what he was to do.
A He was to mate it on the other end, yes.

nary skill in the art. Thus, the M & E criteria, though not technically prior art, were, in effect, properly used as indicators of the level of ordinary skill in the art to which the invention pertained. *Orthopedic Equipment Co. v. United States,* 702 F.2d 1005, 1011, 217 USPQ 193, 199 (Fed.Cir. 1983); *In re Farrenkopf,* 713 F.2d 714, 720, 219 USPQ 1, 6 (Fed.Cir.1983).

An error into which T & B has fallen is its assumption that, in an inquiry under 35 U.S.C. § 103, one looks for the differences between the claimed invention and the prior art in the prior art. This is not the statutory standard. Rather, the statute directs a determination of whether "the differences between the subject matter sought to be patented and the prior art are such that *the subject matter as a whole* would have been obvious ... to a person having ordinary skill in the art ...." (Emphasis added.)

We are satisfied that the subject matter of claim 7, even if construed broadly under the doctrine of equivalents, would not have been obvious to one of ordinary skill in the art at the time the invention was made.

The trial court's analysis under 35 U.S.C. § 103 considered only two references in determining the scope of the prior art: (1) Friend, disclosing a straight-through prior art "D" connector, and (2) the Judd patent. Because we review the *decision,* and not the opinion, of the trial court on the question of whether the claims would be invalid, it is appropriate to take into account all prior art considered by the trial court as relevant to the determination of whether the claimed invention would have been taught by the prior art.[6] The references considered by the trial court under 35 U.S.C. § 102 (Lowry, Key, and the Burndy device) disclose a family of contacts exhibiting a progressive degree of offset from center in a symmetrical fashion, but accomplish this result via contacts having a fixed, previously bent central portion. The element that is missing from these references, as the trial court found, is the presence of contacts having "bendable," rather than "bent," central portions. For this teaching, the trial court relied upon the Judd patent.

However, the "contact" in Judd is not the bendable wire being inserted into the household plug. It is, instead, the pair of insulation-piercing prongs which connect the wire 28 (by its piercing points) at one end with the two power blades at the opposite end. Not only are these prongs explicitly and repeatedly termed "contacts" by the reference itself, but they also fit within the trial judge's own definition of a contact as follows:

An electrical "contact" is one of the electrical conducting elements maintained *within* and forming a part of an electrical connector. A contact may consist of an elongated selectively shaped piece of metal having one end portion adapted to be connected to an electrical conductor, *such as a wire,* and having its other end portion also shaped, *as in the nature of a pin* or socket, to be separably engaged or connected to another properly located electrical contact element in a mating conductor element.

519 F.Supp. at 1193, 213 USPQ at 944 (emphasis added).

A wire inserted into the household plug as the contact, which connects to the plug at one end but is adapted to connect to nothing at the other end, does not comport with the above definition. Although ordinary, bendable household lamp wire would be within the experience of one of ordinary skill in the art, it is not understood how it would teach one of ordinary skill in the art the concept of appellant's contacts having a bendable central portion and adapted to fit between pairs of spaced, offset apertures. Other prior art teaches that, in similar environments, each contact must have a pre-

---

6. However, prior art raised for the first time in this appeal by Winchester, such as Swedish Patent No. 176,317, U.S. Patent No. 3,737,833 (Jerominek); the "3M device"; U.S. Patent No. 3,747,050 (Hecht); and U.S. Patent No. 3,408,- 611 (Katz), will not be considered. *See In re Wiggins,* 488 F.2d 538, 543–44, 179 USPQ 421, 425 (Cust. & Pat.App.1973) and *In re Arkley,* 455 F.2d 586, 589, 172 USPQ 524, 527 (Cust. & Pat.App.1972).

bent central portion resulting in a fixed degree of offset from center.

Winchester argues that the trial court was merely advancing the Judd connector as an example, but does not specify of what Judd is an example. None of the references of record teaches contacts having bendable central portions, and there is no evidence that contacts having bendable central portions would have been within the level of ordinary skill in the art at the time the invention was made.

██ We hold that the district court did not clearly err in finding that Winchester's "single strut" electrical connector is equivalent to T & B's claimed "double strut" electrical connector. However, it did err in refusing to apply the doctrine of equiva-lents (to support T & B's infringement claim) on the ground that claims 7 through 13 and 15 of the Narozny patent, in the broadened scope necessary to support a finding of infringement, would read on the prior art. Accordingly, Winchester's single strut structure infringes the Narozny patent under the doctrine of equivalents.

The decision of the district court is reversed and the case is remanded for a determination of quantum.

REVERSED AND REMANDED.