**B.W.B. CONTROLS, INC.**

v.

**U.S. INDUSTRIES, INC. and Axelson, Inc.**

**Civ. A. No. 82–3914.**

United States District Court,
E.D. Louisiana.

Aug. 26, 1985.

George Bode, Gregory Smith, New Orleans, La., for plaintiff.

Dando Cellini, McGlinchey, Stafford, Mintz, Cellini & Lang, New Orleans, La., John Feather, Jonathan Jobe, Hubbard, Thurman, Turner & Tucker, Dallas, Tex., for defendant.

## JURISDICTION

MENTZ, District Judge.

Jurisdiction is not in dispute and is established under the federal patent laws, 35 U.S.C. § 1 et seq. and under 28 U.S.C. §§ 1338 and 1400. The parties to this proceeding have agreed to bifurcate the issues of liability and damages for purposes of trial. This opinion addresses the liability phase of this litigation.

## BACKGROUND

This is a patent infringement suit involving a pilot relay valve installed in the safety systems of oil and gas pipelines. In view of the inherent dangers of transporting oil and gas under high pressure through a flow pipeline, the U.S. Government requires that all factors be monitored very carefully, and that the flow of oil and gas in the pipeline be blocked, should a problem be sensed in the system. The safety system controls the flow of oil and gas from the well and stops the flow of oil and gas (i.e. closes in or shuts in the system) when the pressure of the oil and/or gas in the pipeline increases or decreases to an unacceptable level. Once the flow of the oil and/or gas in the pipeline has stopped (i.e. once the well is shut-in), safety regulations require that the system must be manually placed back into operation rather than automatically resuming operation. The safety system here includes high and low pressure sensors, a relay valve, and an actuator valve. The relay valve controls the opening and closing of the flow of the pipeline through the actuator valve which in turn is connected to a gate which either allows or blocks the flow of gas and/or oil in the pipeline. *See* Appendix # 2.

For many years, the "state of art" relay valve was an unpatented relay valve which incorporated the "external lockout" mechanism. The Axelson, Inc. (Axelson) "CRBBM" pilot relay valve is an example

of this type of relay. *See* Appendix # 2. This type of relay was referred to as an external lockout relay because of a metal pin contained in a metal body or housing that extruded from the side of the body of the relay. Several problems were encountered with the "external lockout" valve: the pin would rust or "freeze" due to the corrosive offshore environment, the pin, in its position extruding from the body of the relay, might break off, or crew members would position the pin in such a manner so as to by-pass the manual reset feature of the relay, making the relay an automatic relay. B.W.B. Controls, Inc. (BWB) also sold a "BD" pilot relay valve incorporating the external lockout mechanism. *See* Appendix # 1, Glossary of Terms.

In early 1973, Gerald F. Theriot and Frank M. Hoofnagle, employees of BWB, developed an improved pilot relay valve (the type H relay), having an "internal" lockout feature, which functioned without the use of the external pin of the previous "CRBBM' type valve. Plaintiff, BWB, also manufactured a type E relay, incorporating the internal lockout mechanism, with a spring-assisted piston, allowing the relay to shift more quickly to the closed position, and a Type EH relay which incorporated features of both the E relay and the H relay.

On September 6, 1973, BWB, with Theriot and Hoofnagle named as inventors, applied for a patent, herein referred to as the '484 patent, covering this internal lockout relay valve. This patent subsequently issued on April 15, 1975. In September 1974, the Axelson Type I relay valve was developed, and in November and December of 1974, preparations were made for production of this valve by defendant Axelson. The evidence at trial showed that Axelson emergency ordered a BWB internal lockout relay valve on November 15, 1974. In January 1975, the Axelson Type I relay was released for production.

On April 14, 1975, the day before the patent on the '484 patent issued, Theriot and Hoofnagle applied for a patent on a "Pneumatic Relay" as a continuation of the '484 patent. On June 15, 1975, this second patent issued as the '050 patent and was assigned to BWB. BWB contends that the '050 patent is a valid continuation patent and accordingly is entitled to the filing date of the parent patent, i.e., September 6, 1973.

Before the institution of the present proceeding, BWB had made contact with defendant Axelson. On July 10, 1975, BWB wrote Axelson, informing defendant of the issuance of the '484 patent. In 1976 BWB wrote Axelson again, asking whether the defendant was interested in licensing. An exchange of correspondence took place which resulted on February 25, 1977, in the demonstration in Lafayette, Louisiana of Axelson's Type I relay valve. At this time, BWB's president, Ned Bergeron, and its patent attorney, Robert Dickerson, became convinced that the Type I valve did in fact infringe upon both the '484 and '050 patents. Axelson took the position that its valve did not infringe. Although Axelson discontinued the production of the Axelson Type II valve in 1979, the Type I relay is still in production. Both Type I and II valves incorporate the internal lockout feature similar to the patented BWB valves.

## MOTIONS

This Court previously ruled on a Motion for Summary Judgment, filed by defendants, U.S. Industries, Inc., (USI) and Axelson, based on laches and estoppel. The Court GRANTED defendants' motion for summary judgment as to laches and DENIED defendants' motion as it related to estoppel. Although defendants reurged the defense of estoppel at trial, essentially no new or additional evidence has been brought to the Court's attention on these issues, and the Court sees no reason to change its previous ruling.

## FINDINGS OF FACT

1. Plaintiff, B.W.B. Controls, Inc. (hereinafter referred to as BWB) is a corporation organized under the laws of Louisiana, having its principal place of business in Houma, Louisiana. BWB is in the business

of repairing and installing safety systems on offshore platforms, and the production of certain relay valves that are used in these offshore safety systems.

2. Ned Bergeron, George Warren and Mike Brian incorporated BWB in 1972.

3. BWB is the owner of two U.S. Patents, Nos. 3,877,484 and 3,963,050, (hereinafter referred to respectively as the '484 and the '050 patents) covering a pilot operated relay valve. These types of valves are also referred to as pneumatic relay valves, pilot relay valves, pilot valves, control valves or relay valves.

4. Defendant, U.S. Industries, Inc. (hereinafter referred to as USI) is a corporation organized under the laws of New York, having its principal place of business in New York, New York.

5. Defendant Axelson, Inc. (hereinafter referred to as Axelson) is a corporation organized under the laws of Delaware, having its principal place of business in Longview, Texas. Axelson is a wholly owned subsidiary of USI. Among other products, Axelson manufactures a pneumatic relay valve, the Axelson Type 1 relay, which BWB alleges infringes on their '484 and '050 patents.

6. Pilot relay valves are utilized on oil and gas production rig safety systems to automatically shutdown the flow of gas or oil from the well when an abnormal situation develops.

7. Pilot relay valves used in a production rig safety system must, by U.S. Government Regulations, be of a manual reset type. This means that once the flow of oil and gas has been shut down, the system must not be able to automatically return to operation. A worker must manually put the system back into operation.

8. The requirement that the relay valve be manually reopened is met by the use of a lock-out feature in the pilot relay valve.

9. Since at least as early as 1960 and perhaps much earlier, the state of the art lockout feature was the unpatented "external lockout" mechanism as exemplified by the Axelson "CRBBM" pilot relay valve.

10. Between at least as early as 1960, and continuing until 1973, all relay pilot valves, including the Axelson Type "CRBBM", Proflow, Inc.'s Type "E" relay, and in 1972, the BWB Type "BD" pilot relay, incorporated the external lockout mechanism. This type of external lockout relay was the industry standard.

11. Functionally, the external lockout mechanism was mounted to the exterior wall of the pilot relay valve. The lockout mechanism was composed of a metal pin and metal body which housed the pin. The pin within the body of the lockout mechanism moved through a port or hole in the wall of the relay (by means of spring pressure) to engage a slot in the piston wall of the relay once the piston had shifted downward into the closed position. In this situation, the piston could not re-shift to the open position if pilot pressure resumed until the external pin was manually pulled out (disengaging the pin from the slot in the piston).

12. There is a small metal perpendicular bar located near the outside tip of the mechanical lockout pin. The pin can be rotated so that the small perpendicular bar sits in either one of two slots or grooves located on the body housing the pin. Placing the small perpendicular bar in the shallow slot allows the relay to operate as an automatic relay, i.e., once closed, the relay can return into operation without being manually reset. This is possible because when the small perpendicular bar is in the shallow slot or groove, the pin does not engage the slot in the piston when the relay closes. The deep slot allows the relay to function as a manual reset relay. When the small perpendicular bar of the mechanical lockout pin is in the deep slot, the pin is able to engage the slot in the piston wall of the relay, when the relay shifts to the closed position.

13. For the fifteen (15) or more years that the external pin was utilized in the "CRBBM" type valve, numerous problems were confronted, including rusting or "freezing" of the pin due to the corrosive

offshore environment, breaking off of the external lockout pin, or crew members manually setting the pin in the shallow groove so that it could not shift to lock the valve in the closed position. All these situations caused the valve to malfunction. In order to centralize the location of the various relays at an offshore production site, it was considered useful to panel mount the relays. The external lockout relay could not be panel mounted because in order to open the relay, one had to simultaneously pull out on the mechanical pin and up on the top knob.

14. The pilot relay valve industry, in part because of the U.S. government requirements, was constantly in search of a more reliable lockout that would ensure that pilot relay valves would be maintained in the closed position, once shifted closed, until manually reset.

15. In early 1973, Gerald F. Theriot and Frank M. Hoofnagle, employees of BWB, conceived, developed, and began work on an improved pilot relay valve having an internal lockout feature.

16. Previous to that time, between 1972 and 1974, BWB sold and serviced its "BD" pilot relay valve which incorporated an external lockout mechanism.

17. In 1973, Gerald F. Theriot, at that time one of the owners of BWB, and Frank M. Hoofnagle, an engineer employed by BWB, invented the Type "H" pilot control relay valve for BWB. This valve incorporated the "internal lockout" feature.

18. This "internal lockout" feature functioned without the use of the external lockout pin of the previous "CRBBM" Type valve and introduced a completely new concept for maintaining relay valves locked closed until manually reset. This invention, though in a crowded field, represented a significant advance in the art.

19. The "internal lockout" feature incorporated a reduced pilot inlet port and annular seal, providing a reduced valve piston surface area exposed to pilot pressure when the valve was in the closed position. The idea here was that the force created by the pilot pressure acting against the reduced piston surface area was unable to overcome a greater total force created on a larger area of the valve piston holding the valve in the down or closed position. Thus the greater total force of the supply pressure acting against a larger piston maintains the relay in the closed position. The internal lockout feature also includes an enlarged bore adjacent to the pilot inlet port so that in the event instrument fluid pressure does bleed around the annular seal, the valve will not shift open; the fluid will bleed around the piston to a bleed port. *See* Appendix # 5.

20. BWB also manufactures the Type "E" and the Type "EH" controls, both having the internal lockout, but with a spring assisted piston allowing the relay to shift more quickly to the closed position upon the loss of pilot pressure. *See* Appendix # 3.

21. The first control valve manufactured by BWB incorporating the internal lockout feature was sold on or about March 28, 1973. Defendants' Exhibit No. 3.

22. On September 6, 1973, BWB, with Gerald F. Theriot and Frank M. Hoofnagle named as co-inventors, applied for a patent on an invention entitled "Pneumatic Relay" in the U.S. Patent and Trademark Office. This patent would eventually issue as the '484 patent. Plaintiff's Exhibit No. 1.

23. The '484 patent application, as originally filed, contained 14 claims. Claim 1 was written as an independent claim and claims 2 through 14 were dependent claims. Plaintiff's Exhibit No. 56.

24. After reviewing the patent application, the patent examiner (in Paper No. 2 in the '484 file wrapper) rejected claims 1–14 on the basis of 35 U.S.C. § 112. This section requires an applicant to describe the invention in clear and concise terms. The patent examiner indicated that claims 2–14 would be allowed if rewritten so as to correct certain technical inaccuracies. Claims 1 and 2 were rejected under 35 U.S.C. § 102 as being anticipated by two prior art patents, the Pauliukonis patent, U.S. Patent No. 3,706,325, and the Kaem-

mer patent, U.S. Patent No. 3,741,247. Plaintiff's Exhibit No. 56.

25. In response to this initial rejection by the patent office, an amendment to the claims was filed. Plaintiff's Exhibit No. 56.

26. In Paper No. 6 of the '484 file wrapper, the examiner allowed claims 3 through 14. Claim 3 had been redrafted as an independent claim. Claims 1 and 2 were again rejected as being anticipated by the Pauliukonis patent. The examiner made this action final. Plaintiff's Exhibit No. 56.

27. In response to this action, the applicants filed a second amendment to their claims under a specific procedure which allows a patent applicant another chance to get his application in shape rather than appealing the patent examiner's decision. By this second amendment, certain language was added at the end of claim 1, and claim 2 was cancelled. Plaintiff's Exhibit No. 56.

28. The examiner subsequently allowed all the claims of the '484 patent application, now renumbered claims 1 through 13. Plaintiff's Exhibit No. 56.

29. The '484 patent issued on April 15, 1975. Plaintiff's Exhibit No. 56.

30. On April 14, 1975, the day before the '484 patent issued, a subsequent patent application was filed by BWB. This patent eventually issued as the '050 patent. This subsequent patent was intended to be a continuation patent to the '484 patent. Although there were various methods by which Mr. Dickerson, BWB's patent attorney, could have filed a continuation application, Dickerson chose to retype the specification and write out new claims. Plaintiff's Exhibit No. 62.

31. There are three places where the specification of the '484 patent and that of the '050 patent differ: 1) The entire second paragraph of the '484 specification (column 1, lines 8–12) is missing from the '050 specification. That paragraph in the '484 specification provides:

More particularly, the invention is concerned with a relay which operates solely on pressure differential, utilizing only a single moving part so as to provide a simple and trouble free unit which is unique in both structure and operation.

2) the first sentence of the third paragraph from the end of the '484 specification (column 3, lines 33–37) provides:

As yet a further safeguard, and in order to make the relay fail safe in operation, provision is also made for a situation wherein the actuator fluid pressure is lost in conjunction with a restoration of the control fluid pressure.

The same sentence in the '050 specification adds language at the end of the sentence (column 3, lines 25–29 of the '050 specification):

As yet a further safeguard, and in order to make the relay fail safe in operation, provision is also made for a situation wherein the actuator fluid pressure is lost in conjunction with a restoration of the control fluid pressure, or if some slight leakage around seal 40 occurs.

3) The last sentence in the second to last paragraph of the '484 specification (column 3, lines 60–64) provides:

This valve incorporates only a single moving part yet provides for a complete control, including a lock-out feature which accommodates any foreseeable circumstance effectively and simply without in anyway [sic] affecting the manual resetting of the relay.

This same sentence in the '050 specification omits certain language (column 4, lines 8–11):

This valve incorporates a lock-out feature which accommodates any foreseeable circumstance effectively and simply without in anyway [sic] affecting the manual resetting of the relay.

Plaintiff's Exhibit Nos. 56 & 62. Defendants' Exhibit No. 5.

32. Although the language of the '484 specification and the '050 specification is not completely identical, the substance of the two specifications is the same. The changes made in the '050 specification do not introduce new matter into the patent.

33. The '050 patent application was originally filed with six claims. The examiner rejected claims 1 & 2 under 35 U.S.C. § 102 as being anticipated by a prior art patent, the McMullan patent, U.S. Patent No. 3,823,739. Claims 4 & 6 were rejected under 35 U.S.C. § 103 as being "obvious" in light of the McMullen patent. Claim 5 was rejected under 35 U.S.C. § 103 as being obvious in light of either the McMullen patent or the Peters patent, U.S. Patent No. 3,746,047. The examiner also rejected all claims 1 through 6 under 35 U.S.C. § 102 as being anticipated by the '484 patent. This last rejection was based on the fact that the '484 patent and the original application in the '050 patent application showed different inventive entities. Plaintiff's Exhibit No. 62.

34. In response to the examiner's initial rejection, the applicants filed an amendment, amending claim I and withdrawing or cancelling claims 2 through 6. A substitute oath was also filed which the applicants contended corrected the problems with the identification of the inventive entity. Plaintiff's Exhibit No. 62.

35. In Paper No. 4 of the '050 file wrapper, the examiner again rejected claim 1 as anticipated by the '484 patent because of an improper oath of inventorship. The examiner indicated that if a proper conversion of inventive entity was made, a terminal disclaimer would have to be filed before any indication of allowability would be made. The examiner made this action final. Plaintiff's Exhibit No. 62.

36. After another oath of inventorship was filed and a terminal disclaimer was made, the patent examiner allowed Claim 1 of the '050 patent application on June 15, 1976. The examiner was evidently satisfied that the problems with the inventive entity had been cleared up. Plaintiff's Exhibit No. 62.

37. In September of 1974, David Snyder, an employee of Axelson, was working on the design for the Type 1 and Type 2 relays. Snyder had just begun working at Axelson one month earlier, in August of 1974, as senior design engineer at Axelson and was in charge of working with control systems and control components.

38. From September 1974 to January 1975, Snyder prepared drawings for the Type 1 relay and started the wheels in motion for the eventual production of the relay: models were made, tests were run, and engineering orders for the various parts were made. The Type 1 relay went into production in January of 1975. Defendants' Exhibit Nos. 19–35.

39. Axelson emergency ordered a BWB internal lockout relay on November 15, 1974. The relay was ordered by the Axelson office in Houma, Louisiana and charged to the account of the Axelson office in Longview, Texas to the design department, the department where Snyder worked.

40. The evidence at trial indicated that the Axelson Type 1 relay was commercially successful.

41. The BWB internal lockout relay was also a commercially successful product. Plaintiff's Exhibit No. 52.

42. Although the external lockout relay is still sold, it has been by and large replaced by the internal lockout relay in oil and gas safety systems.

43. The record reflects that the first contact that plaintiff made with defendant was on or about July 10, 1975, when Ned Bergeron, the president of BWB, wrote a letter to Charles Phillips at Axelson informing Phillips that the '484 patent had been issued to BWB. Defendants' Exhibit # 1.

44. On August 24, 1976, Mr. Dickerson, BWB's patent attorney at that time, wrote a letter to Axelson suggesting license negotiations as regards Axelson's Type 1 relay. Defendants' Exhibit # 2. On October 8, 1976 Dickerson again wrote Axelson stating that he had received no response from his previous letter and wanted to know if Axelson was interested in licensing negotiations as regards the Axelson Type 1 relay. Defendants' Attachment No. 5, Defendants' Motion for Summary Judgment, R. III, Doc. 48.

45. William Hyer, defendants' counsel at that time, wrote Mr. Dickerson a letter on November 1, 1976 stating that he (Hyer) would get back in touch with Mr. Dickerson as regards the proposal of licensing negotiations. Plaintiff's Attachment No. 6, Plaintiff's Opposition to Defendants' Motion for Summary Judgment, R. III, Doc. 49.

46. Mr. Dickerson again wrote Mr. Hyer on January 7, 1977. Dickerson stated that he hoped that by that time, Mr. Hyer had received the necessary documentation from the patent office and that Dickerson would expect to hear from Mr. Hyer at the latter's earliest convenience. Plaintiff's Attachment No. 7, Plaintiff's Opposition to Defendants' Motion for Summary Judgment, R. III, Doc. 49.

47. A demonstration of the Axelson Type 1 relay was held in the Axelson shop in Lafayette, Louisiana on February 25, 1977. Among others, the following people were present at this demonstration: David Snyder, Axelson engineer and designer of the Type I relay, William Hyer, defendants' attorney, Ned Bergeron, the president of BWB, and Robert Dickerson, BWB's attorney.

48. An inter-company memorandum was written by Mr. Snyder to Mr. Brabits at Axelson on February 28, 1977, after the Lafayette demonstration. The memorandum described the demonstration at Axelson's Lafayette Shop and contained Snyder's opinion that the Type 1 relay did not infringe the BWB internal lockout relay. Plaintiff's Exhibit No. 38.

49. After the demonstration, Mr. Dickerson wrote Mr. Hyer a letter, dated March 3, 1977. Mr. Dickerson stated that the demonstration enhanced his opinion of infringement. Mr. Dickerson offered Axelson a licensing agreement proposal. Plaintiff's Attachment No. 10, Plaintiff's Opposition to Defendants' Motion for Summary Judgment, R. III, Doc. 49.

50. Several days later, on March 7, 1977, Mr. Hyer responded by letter to Mr. Dickerson's proposal of a license agreement, stating that Mr. Hyer would take the matter up with his client. Plaintiff's Attachment No. 11, Plaintiff's Opposition to Defendants' Motion for Summary Judgment, R. III, Doc. 49.

51. One year and approximately nine months later, Mr. Dickerson again wrote Mr. Hyer a letter dated December 6, 1978, reiterating the former's opinion of infringement and suggesting a license agreement. Defendants' Exhibit No. 4.

52. Shortly thereafter, on December 28, 1978, Mr. Hyer responded by letter to Mr. Dickerson. Mr. Hyer denied that there was any infringement of the BWB relay by the Axelson Type 1 relay, and stated he had no interest in licensing negotiations and that it was his impression that the matter had been put to rest long ago. Plaintiff's Exhibit No. 51.

53. Over three and half years later, BWB filed this suit against Axelson and USI on September 2, 1982 alleging that the Type 1 relay infringed Claims 1 and 2 of the '484 patent and Claim 1 of the '050 patent.

54. There is no evidence that plaintiff was involved in other litigation prior to the institution of this suit in 1982. Nor was there any evidence that plaintiff informed defendants of an intention to pursue their rights under the patents-in-suit. Plaintiff explains that the delay in filing suit was due to insufficient financial resources to instigate litigation.

55. Axelson has made a heavy investment in facilities used in the production of the Axelson Type I relay.

56. The Axelson Type I relay incorporates the internal lockout features of the BWB internal lockout relay as covered in the '484 and '050 patents. The Type I relay has all the features of the internal lockout: the small tip (or reduced area) at the bottom of the relay's piston; the enlarged bore or undercut area (i.e., the dual diameter bores) at the bottom end of the relay; and the exhaust port and vent port. In the Axelson relay one port serves the function of both exhaust and vent. These features allow any pilot instrument fluid

that leaks around the small tip, when the relay is in the closed position, to be exhausted through the undercut and out the vent port.

57. Claim 1 of the '484 patent provides:
1. A valve comprising a valve body, an elongated bore within said body, a first fluid inlet port, an outlet port, a bleed port, a second fluid inlet port, a valve member slidable within said bore, said valve member presenting a first pressure surface on said valve member exposed to said first fluid inlet port, a second pressure surface on said valve member exposed to said second fluid inlet port, said valve being selectively shiftable between a first position allowing communication between the first fluid inlet port and the outlet port and precluding communication between the outlet port and the bleed port, and a second position allowing communication between said outlet port and said bleed port and precluding communication between said first fluid inlet port and said outlet port, a greater total force on said second pressure surface than on said first pressure surface maintaining said valve member in said first position, a greater total force on said first pressure surface than on said second pressure surface moving said valve to said second position, and means for effectively precluiding [sic] fluid pressure supplied said valve through said second fluid inlet port from moving said valve from said second position to said first position, said precluding means including a) an exhaust port in fluid communication with said second fluid inlet port only when said valve member is in a further position intermediate said first and second positions, and b) seal means preventing fluid communication between said exhaust port and said second fluid inlet port when said valve member is in said first and second positions.
Plaintiff's Exhibit No. 1.

58. In reading over Claim 1, each element named in the claim is found in the Axelson Type I relay. The Type I relay is a valve that has a valve body, an elongated bore within that body, a first fluid inlet port (port where the actuator pressure enters the relay), an outlet port, a bleed port, a second fluid inlet port (port through which the instrument pressure enters the relay). The valve member of the Axelson Type I relay is slidable within the elongated bore and does present a first pressure surface exposed to the first fluid inlet port and a second pressure surface exposed to the second fluid inlet port.

59. The demonstration of the Axelson Type I relay in the courtroom showed that the relay did shift to the closed position with the application of actuator pressure and in the absence of instrument fluid pressure. This is evidence that the Axelson Type 1 relay does have a first fluid pressure surface.

60. The Axelson Type I relay is shiftable between a first or open position and a second or closed position. A greater force on the second pressure surface than on the first pressure surface maintains the Type I valve in the first or open position. A greater force on the first pressure surface moves the Type I relay into the closed position.

61. Defendants contend that the Axelson Type I relay does not infringe the BWB relay because there is no first pressure surface in the Axelson relay against which actuator pressure acts to close the relay. Since the claim calls for a first pressure surface and the Axelson relay does not have one, defendants contend there is no infringement. David Snyder testified that the spring in the Axelson relay was the force which closed the relay. Snyder stated that there was no pressure surface against which actuator pressure acted to close the relay. Snyder stated that in the courtroom demonstration of the valves, the Axelson relay sometimes shifted to the closed position, and at other times, the relay did not shift. Snyder explained why, in his opinion, the Axelson relay, when demonstrated in the courtroom without the spring, did sometimes close with the institution of actuator pressure. Snyder drew a distinction between those instances when

the Axelson relay was put into the open position manually by pulling up on the knob, and those instances when the relay was put into the open position because of the application of instrument pressure. In the latter situation, Snyder testified that the Axelson relay, without a spring, did not move to the closed position with the application of increasing actuator pressure.

Snyder explained that the bottom piston in the Axelson relay is free-floating. This is unlike the bottom part of the piston of the BWB relay which is attached to the main piston. When the BWB internal lock relay is pulled up manually (by the knob) into the open position, the bottom of the piston (containing the small tip and the larger piston located right above the small tip on the piston) moves up also, and the larger o ring thereby comes into sealing engagement with the bore in the relay. However, when the Axelson relay is pulled manually into the open position, the bottom part of the piston does not move up, and, therefore, the larger o ring does not go into sealing engagement with the bore of the relay. In this situation, with no instrument pressure and the application of actuator pressure, the relay moves into the closed position. On the other hand, when the Axelson relay is in the open position because of the application of instrument pressure, the larger o ring at the bottom part of the piston does engage the bore of the relay. In that situation, when instrument pressure is taken away, the additional friction created by the larger o ring in sealing engagement with the bore of the relay, prevents the increasing application of actuator pressure from causing the relay to move from the open to the closed position. Snyder concludes that the relay does not, therefore, move from the open to the closed position by means of fluid pressure differential. Plaintiff's Exhibit Nos. 20 & 21, Defendants' Exhibit No. 6.

62. The claim of the BWB patent speaks of a valve that is shifted from the open to the closed position by means of fluid pressure differential. The testimony at trial indicated that it was very common to substitute a spring or weight for fluid pressure. Plaintiff's Exhibit No. 1.

63. The last part of Claim 1 of the '484 patent contains a "means" clause: means for precluding pressure supplied through the pilot port (or second fluid inlet port) from pushing the valve from the closed to the open position. The means are not completely delineated but the claim does specify two elements which this "precluding means" includes: a) an exhaust port in fluid communication with the second fluid inlet port only when the relay is in an intermediate position, neither open nor closed, and b) a seal means preventing fluid communication between the second fluid inlet port and the exhaust port when the relay is in either the open (first) or closed (second) position. Obviously "a" and "b" cannot be present in the relay simultaneously since "a" allows communication between two ports and "b" prevents communication between the same two ports. There is nothing mentioned in the claim to indicate whether "a" is a temporary or a static condition or position.

64. Claim 1 speaks of a bleed port and an exhaust port. In the actual physical example of the BWB internal lockout relay, the bleed port and the exhaust port are two separate ports. In the Axelson Type 1 relay, one port performs both the function of the bleed port and the exhaust port.

65. Defendants argue that it is the spring in the Axelson Type I relay that prevents the relay from moving from the closed to the open position when there is a return of instrument pressure. The Court finds that although this is true, the spring is not the only "preventing" means on the Axelson Type I relay.

66. The demonstration of the Type I relay showed that it does have an "intermediate" position where instrument pressure leaks around the small tip piston, through the undercut or enlarged bore and out the exhaust port. This situation occurs if the relay is closed and there is a return of instrument pressure and the small tip piston is not in sealing engagement with the pilot port (possibly because of a leaking or

missing o ring). The testimony showed that o rings need to be replaced periodically because they wear out from use. In addition, this situation of leakage around the undercut and out the exhaust port occurs briefly when the relay is in the process of going from the open to the closed position.

67. The Type I relay does have sealing means which prevents communication between the pilot inlet port and the exhaust port when the valve is in the open position (in which case the sealing means would be the larger diameter piston at the bottom of the relay in sealing engagement with the bore or inside wall of the relay) and in the closed position (in which case the sealing means would be the small tip of the relay piston in sealing engagement with the wall of the relay).

68. Claim 2 of the '484 patent provides:

2. A valve comprising a valve body, an elongated bore within said body, a first fluid inlet port, an outlet port, a bleed port, a second fluid inlet port, a valve member slidable within said bore, said valve member presenting a first fluid pressure surface on said valve member exposed to said first fluid inlet port, a second fluid pressure surface on said valve member exposed to said second fluid inlet port, said valve member being selectively shiftable between a first position allowing communication between the first fluid inlet port and the outlet port and precluding communication between the outlet port and the bleed port, and a second position allowing communication between said outlet port and said bleed port and precluding communication between said first fluid inlet port and said outlet port, a greater total force on said second pressure surface than on said first pressure surface maintaining said valve in said first position, a greater total force on said first pressure surface than on said second pressure surface moving said valve to said second position, a valve seat about said second fluid inlet port, said valve member including a portion thereon receivable within said seat to close said second fluid inlet port upon movement of the valve member from the first position thereof to the second position, and an exhaust port selectively communicated with said second fluid inlet port when said valve member is in a position intermediate said first and said second position.

Plaintiff's Exhibit No. 1.

69. Claim 2 of the '484 patent is virtually identical to Claim 1 of the '484 patent up to the language at the end of Claim 2 beginning with "a valve seat about said second fluid inlet port, said valve member including a portion thereon...." The only difference in the first part of Claim 2 and Claim 1 is 1) the addition of the word "fluid" on line 5 of Claim 2 in referring to the "first fluid pressure surface" [Claim 1 reads "first pressure surface"] and 2) the omission of the word "member" after the word "valve" on line 21 of Claim 2 [Claim 1 reads "said valve member in said first position"]. These 2 minor changes do not change the coverage of the claim and the Axelson Type 1 relay still has all the elements of this first part of Claim 2 of the '484 patent. Plaintiff's Exhibit No. 1.

70. The Axelson Type 1 relay has all the elements of the latter part of Claim 2. The latter part of Claim 2 provides:

[A] valve seat about said second fluid inlet port, said valve member including a portion thereon receivable within said seat to close said second fluid inlet port upon movement of the valve member from the first position thereof to the second position, and an exhaust port selectively communicated with said second fluid inlet port when said valve member is in a position intermediate said first and said second position.

The Type 1 relay does have a valve seat in the second fluid inlet port or the pilot port which receives the small tip (or reduced area) of the relay's piston when the valve is moved to the closed position. The exhaust port in the Type 1 relay does selectively communicate with the second fluid inlet port when the relay is in a position interme-

diate the open and closed positions. Plaintiff's Exhibit No. 1.

71. Claim 1 of the '050 patent provides:

1. A valve comprising a valve body, an elongated bore within said body, a first fluid inlet port, an outlet port, a bleed port, second fluid inlet port, valve member slidable within said bore, means for positioning said valve member in a first position whereby communication is permitted between said first inlet port and said outlet port but communication is precluded between said bleed port and said outlet port, means for positioning said valve member in a second position whereby communication is permitted between said bleed port and said outlet port but is precluded between said first inlet port and said outlet port, and means for preventing pressure exerted against said valve member through said second inlet port from moving said valve member from said second position to said first position, wherein said preventing means includes first and second enlarged portions of said bore intermediate said second fluid inlet port and said first fluid inlet port, one of said enlarged portions sealingly accommodating said valve member and the other of said enlarged portions being of such greater diameter than said valve member as to not sealingly accommodate said valve member.

Plaintiff's Exhibit No. 2.

72. Again, all of the elements enumerated in this claim are contained in the Type 1 relay. The Axelson relay has a valve body, an elongated bore within the valve body, a first fluid inlet port, one port that serves the function both of the outlet port and the bleed port, a second fluid inlet port and a valve member slidable within the bore.

73. The Axelson Type 1 relay does have "means" for positioning the valve in the first position and the second position.

74. The description of the "preventing means" in Claim 1 of the '050 patent is very similar to the description of the preventing means in Claims 1 & 2 of the '484 patent. The "preventing means" refers to the means that prevents pressure entering the relay through the second fluid inlet port from moving the relay from the second position to the first position. The claim provides that the preventing means includes first and second enlarged portions of the bore intermediate the second fluid inlet port and the first fluid inlet port, one bore which forms a seal with the valve member [when the relay is in the open position] and the other enlarged bore which does not form a seal with the valve member [when the relay is in the closed position].

75. The specification of the '484 patent describes a relay that is operated by fluid pressure differential. Plaintiff's Exhibit No. 1.

76. The last paragraph of the '484 specification provides:

The foregoing is considered as illustrative only of the principles of the invention. Further, since numerous modifications and changes will readily occur to those skilled in the art, it is not desired to limit the invention to the exact construction and operation shown and described, and accordingly all suitable modifications and equivalents may be resorted to, falling within the scope of the invention.

Plaintiff's Exhibit No. 1.

77. Defendants urge that the "internal lockout" feature of the BWB relay was disclosed by the prior art. Defendants point specifically to three prior art patents: Kanuch, U.S. Patent No. 2,667,896 (the Kanuch patent), Leonardi, U.S. Patent No. 1,309,482 (the Leonardi patent) and Buttner, U.S. Patent No. 2,380,576 (the Buttner Patent). The Court finds, however, that each of these three patents can be distinguished from the BWB patent and that the '484 and '050 patents are not "anticipated" by or "obvious" in light of either the Kanuch, the Buttner or the Leonardi patent. Defendants' Exhibits Nos. 41, 42, and 43.

78. The Kanuch patent, known since at least as early as 1954, provides a valve

constructed to remain closed despite the application of fluid pressure, until shifted manually and thereafter to remain open so long as the fluid pressure flows through the valve to an exit port (No. 9 on the figure shown on the Kanuch patent). The Kanuch device can accommodate some light leakage around the small diameter piston if the valve seal (No. 16) should fail. However, the Kanuch patent is a one line system such that any bleeding of fluid past the valve piston is communicated to the exit port. The Kanuch does not provide for a second control fluid to control the communication of the primary fluid between the inlet port and the outlet port. Furthermore, the purpose of the Kanuch valve is different from the internal lockout relay. The Kanuch valve was designed as an unloading valve. Defendants' Exhibit No. 41.

79. The Leonardi patent, Defendants' Exhibit No. 42, discloses a valve in which should fluid escape between the valving element (No. 28 on figure in the Leonardi patent) and its seat (No. 29), the valve will move open and remain open until a pressure drop occurs and, thus does not provide for "bleeding" or "venting" the control fluid to atmosphere. The Leonardi patent is a one line system such that any bleeding of fluid past the valve piston is communicated to the exit port and not vented to the atmosphere.

80. The Buttner patent discloses a valve maintained in the closed position by a pressure imbalance because of the differing area size. However, once force is applied to the valve, it will remain open until pressure drops. No structure is provided for "bleeding" or "venting" control fluid to the atmosphere. As in the previous two patents, the valve in the Buttner patent is applicable only to a one line system, and should the valve member be unseated, fluid will exit and not be vented to atmosphere. Defendants' Exhibit No. 43.

81. No prior art reference, including all of the patents cited by the defendants, combine the same elements of the BWB '484 and '050 patents in substantially

the same situation so as to perform the unique functions of the BWB invention.

82. The U.S. Patent Office has set up a classification system for patents, dividing the over four million patents into classes and subclasses. This division of patents aids the patent examiner in conducting his survey of the prior art and ultimately in deciding whether a certain patent should be granted or not.

83. The Kanuch, Buttner and Leonardi patents were all cited as cross-references in subclasses that the file wrapper reflects were searched by the patent examiner. Plaintiff's Exhibit Nos. 56, 62, 83A–83C, 84A–84C, 85A–85D.

84. Plaintiff in claiming infringement in the instant proceeding is not relying on subject matter which he surrendered during the prosecution of the '484 and the '050 patent applications.

85. Defendants admitted at trial that Axelson was a subsidiary of USI. However, no evidence was presented showing that the corporate entities of Axelson and USI were disregarded. For example, no evidence was shown as to the degree of control that USI has over Axelson, or as to any co-mingling of the funds of Axelson and USI.

## CONCLUSIONS OF LAW

1. This is a suit involving patent infringement, validity and enforcement and the Court has jurisdiction over the parties and the subject matter, and venue is proper. 28 U.S.C. §§ 1338, 1391(c), and 1400(b).

2. In a patent case, invalidity and infringement are two separate issues. The party asserting infringement, in this case the plaintiff, BWB, has the burden of proof to establish by a preponderance of the evidence that defendants' manufacture, use, and sale of the article in question, here the relay valves, have infringed any of the claims of the BWB '484 and/or '050 patents. *Moore v. Shultz*, 491 F.2d 294, 298 (10th Cir.), *cert. denied*, 419 U.S. 930, 95 S.Ct. 203, 42 L.Ed.2d 161 (1974); *Hughes*

*Aircraft Co. v. U.S.*, 717 F.2d 1351 (Fed. Cir.1983).

■ 3. The burden of establishing the invalidity of the patent or any claim thereof is on the party asserting such, in this case, the defendants. Furthermore, a patent issued by the U.S. Patent Office is presumed valid. 35 U.S.C. § 282; *Radio Corp. of America v. Radio Engineering Laboratories, Inc.*, 293 U.S. 1, 7, 55 S.Ct. 928, 930, 78 L.Ed. 1453 (1934); *Continental Oil Company v. Cole*, 634 F.2d 188, 195 (5th Cir.), *cert. denied*, 454 U.S. 830, 102 S.Ct. 124, 70 L.Ed.2d 106 (1981); *Ingersoll-Rand Co. v. Brunner & Lay, Inc.*, 474 F.2d 491, 496 (5th Cir.), *cert. denied*, 414 U.S. 865, 94 S.Ct. 125, 38 L.Ed.2d 117 (1973); *Hughes Aircraft Co. v. U.S.*, 717 F.2d 1351, 1359 (Fed.Cir.1983). This presumption of validity is weakened, however, when relevant prior art has not been considered by the patent examiner. *General Battery Corp. v. Gould, Inc.*, 545 F.Supp. 731, 740 (D.Del. 1982).

4. Before ruling on infringement, the Court will decide the issue of patent validity. The defendants have asserted the defenses of anticipation and obviousness in support of their contention that the patents are invalid. The defendants further contend that the patents are invalid because of BWB's allegedly fraudulent conduct in the prosecution of the patent applications of the patents-in-suit, specifically the '050 patent.

■ 5. Anticipation is a technical defense which must meet strict standards. Unless all of the same elements are found in substantially the same situation and united in the same way to perform the identical function in a single prior art reference, there is no anticipation. In other words, to reach a finding of invalidity under § 102 of the Patent Act, the Court must find that a prior art reference shows each and every element claimed. *RCA Corp. v. Applied Digital Data Systems, Inc.*, 730 F.2d 1440 (Fed.Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 32, 82 L.Ed.2d 923 (1984); *Leinoff v. Louis Milona & Sons, Inc.*, 726 F.2d 734 (Fed.Cir.1984); *Kalman v. Kimberly-Clark Corp.*, 713 F.2d 760, 772 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984); *Radio Steel & Manufacturing Co. v. MTD Products, Inc.*, 731 F.2d 840 (Fed.Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 119, 83 L.Ed.2d 62 (1984).

■ 6. Furthermore, with an element expressed in terms of a means plus function, absent structure in a prior art reference which is capable of performing the functional limitation of the "means", the prior art reference does not meet the claim, and anticipation is not proven. *RCA Corp. v. Applied Digital Data Systems, Inc.*, 730 F.2d 1440 (Fed.Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 32, 82 L.Ed.2d 923 (1984); *Application of Mott*, 557 F.2d 266, 269 (C.C.P.A.1977).

7. 35 U.S.C. § 103 provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

8. A patent may not be obtained if the differences between the claimed subject matter and the prior art are such that the claimed subject matter as a whole would have been obvious, at the time the invention was made, to a person of ordinary skill in the art. 35 U.S.C. § 103.

■ 9. The ultimate question of patent validity, including obviousness is one of law. However, the obviousness issue rests on three factual determinations: (1) the scope and content of the prior art; (2) the differences between the prior art and the invention; and (3) the level of ordinary skill in the art. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545

(1966). The *Graham* Court noted certain "secondary" indicia of obviousness:

> Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

383 U.S. at 17–18, 86 S.Ct. at 693–94. The court in *Sarkisian v. Winn-Proof Corp.* noted that these secondary criteria are relevant in determining the level of ordinary skill in the relevant art and, therefore, in determining obviousness. 697 F.2d 1313, 1320 (9th Cir.), *cert. denied,* 460 U.S. 1052, 103 S.Ct. 1499, 75 L.Ed.2d 930 (1983).

■ 10. Because the Court has found that the prior art patents can be distinguished, there is no evidence on which to base a defense of anticipation. The Court holds that the defense of anticipation is inapplicable here.

■ 11. The testimony at trial reflected that the prior art was in a fairly crowded field. However, the Court has already noted that the prior art patents are distinguishable. Furthermore, the testimony showed that the level of skill in the art was fairly high. Despite this, the external lockout was in use for many years before the internal lockout was developed. The internal lockout has been commercially successfull and has taken over a significant portion of the external lockout relay's market. After reviewing all the relevant evidence, the Court has concluded that the subject matter of the patents-in-suit would not have been obvious to a person of ordinary skill in the art at the time the invention was made.

12. In *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* the Court of Appeals for the Federal Circuit confirmed the historical two prong test for establishing fraud on the Patent Office: (1) the information withheld must be material and (2) the misrepresentation or omission must be intentional. 725 F.2d 1350 (Fed.Cir.), *cert.*

*denied,* —— U.S. ——, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

13. Current patent Office rules define materiality as follows:

> Such information is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.

37 C.F.R. § 1.56(a).

■ 14. The Court finds that there was no act or pattern of acts in this case which would constitute egregious conduct sufficient to justify the invalidity of a patent. Although there was testimony that put into question the validity of a notarial act as a notarial act, the evidence showed that while the place of signature listed on the final oath of inventorship in the '050 patent application might be incorrect, the signature and the other facts enumerated therein were true and unquestioned. The oath itself did not need to be notarized to be an effective declaration of inventorship. While the Court does not condone such conduct (signing a notarial act stating under oath that you are in one city while in reality you are not), it is not so egregious so as to require the invalidation of the '050 patent.

■ 15. For a continuation patent to be valid and entitled to the earlier filing date of the parent patent application under 35 U.S.C. § 120, no new matter must be added. *Litton Systems, Inc. v. Whirlpool Corp.,* 728 F.2d 1423 (Fed.Cir.1984). However, matter which is added that is deemed inherent in the original application, is not considered new matter so as to bar the added matter from being entitled to the earlier filing date of the parent patent. *In re Lange,* 644 F.2d 856 (C.C.P.A.1981).

16. Under 35 U.S.C. § 102(b), if an invention was sold or in use for more than one year prior to the filing of a patent application on that device, the device is not eligible to receive a patent. In the situation before the Court today, if the '050 patent is not a proper continuation patent, it would be barred from obtaining a patent

since the device was sold or in use for more than one year prior to the filing of the '050 patent application.

17. The Court finds that the '050 patent is a valid continuation patent to the '484 patent. The changes in the specification of the '484 patent to the '050 patent do not add new matter. Furthermore, the Court notes that plaintiff filed a terminal disclaimer in the application for the '050 patent. Such disclaimer limits the '050 patent to the duration of the '484 patent.

18. Having concluded that the patents-in-suit are valid, the Court will now address the issue of infringement. Infringement can be established under the doctrine of literal infringement or under the doctrine of equivalence. Literal infringement occurs when the accused device incorporates all the elements of the patent. Under literal infringement, resort must be made to the wording of the claims. If the accused matter falls within the claims, infringement is proven. *Graver Tank & Manufacturing Co., Inc., v. Linde Air Products Co.,* 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950); *Envirotech Corp. v. Al George, Inc.,* 730 F.2d 753 (Fed.Cir.1984). Modifications by mere *addition* of elements or functions, wherever made, cannot negate infringement. *Cochrane v. Deener,* 94 U.S. 780, 786, 24 L.Ed. 139 (1876); *Amstar Corp. v. Envirotech Corp.,* 730 F.2d 1476, 1482 (Fed.Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 306, 83 L.Ed.2d 240 (1984).

19. Infringement under the doctrine of equivalence occurs if the accused device performs substantially the same function, in substantially the same way to obtain the same result. *Graver Tank & Manufacturing Co., Inc. v. Linde Air Products Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). The test of equivalency extends beyond what is literally stated in the patentee's specification to be equivalent and encompasses any element which one of ordinary skill in the art would perceive as interchangeable with the claimed element. *Thomas & Betts*

*Corp. v. Litton Systems, Inc.,* 720 F.2d 1572, 1579 (Fed.Cir.1983).

The doctrine of equivalents is applicable when actual infringement is not present. *Envirotech Corp. v. Al George, Inc.,* 730 F.2d 753 (Fed.Cir.1984). This doctrine protects the patent from a copyist making an unimportant and insubstantial change or substitution which adds nothing to the invention and attempts to take the copied matter outside the reach of the patent. *Radio Steel & Manufacturing Co. v. MTD Products, Inc.,* 731 F.2d 840, 847 (Fed.Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 119, 83 L.Ed.2d 62 (1984). Exact identity of function, way and result are not required, as the doctrine is based on "substantial" not exact identity. *See Perkin-Elmer Corp. v. Computervision Corp.,* 680 F.2d 669 (9th Cir.1982), *cert. denied,* —— U.S. ——, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984). A finding of equivalence is a determination of fact which may be based on proof by testimony of experts. *Graver Tank & Manufacturing Co., Inc. v. Linde Air Products Co.,* 339 U.S. 605, 609, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950); *Envirotech Corp. v. Al George, Inc.,* 730 F.2d 753, 761 (Fed.Cir.1984).

20. In determining the scope or range of equivalence that is to be given a patent, courts consider whether the patent that is allegedly infringed is a pioneer patent or a mere improvement. A pioneer patent is entitled to a broad range application under the doctrine of equivalents. *Thomas & Betts Corp. v. Litton Systems, Inc.,* 720 F.2d 1572 (Fed.Cir.1983); *Ziegler v. Phillips Petroleum Company,* 483 F.2d 858 (5th Cir.), *cert. denied,* 414 U.S. 1079, 94 S.Ct. 597, 38 L.Ed.2d 485 (1973). As the Court of Appeals for the Federal Circuit recently noted,

[W]hile a pioneer invention is entitled to a broad range application of the doctrine of equivalents, an invention representing only a modest advance over the prior art is given a more restricted (narrower range) application of the doctrine. When a patentee claims an improvement over an earlier invention, other parties are

entitled to practice variations of that prior invention, so long as they are not the same as, or an equivalent of, the improvement claimed by the patentee. *Thomas & Betts Corp. v. Litton Systems, Inc.*, 720 F.2d 1572, 1580 (Fed.Cir.1983). According to the Fifth Circuit, a "pioneer" patent which covers a function never performed before, receives a much broader protection than a patent which merely makes minor improvements upon existing technology. *Studiengesellschaft Kohle v. Eastman Kodak Co.*, 616 F.2d 1315, 1324 (5th Cir.), *cert. denied*, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980); *LaSalle v. Carlton's Laydown Service, Inc.*, 680 F.2d 432 (5th Cir.1982).

■■■ 21. The application of the doctrine of equivalents may be limited by prosecution history estoppel (sometimes referred to as file wrapper estoppel), which precludes a patentee from obtaining a claim construction that would resurrect subject matter surrendered during the prosecution of his patent application. *Thomas & Betts Corp. v. Litton Systems, Inc.*, 720 F.2d at 1579; *Hughes Aircraft Co. v. U.S.*, 717 F.2d 1351 (Fed.Cir.1983). Where an applicant has amended a claim in the patent office to overcome a rejection based upon prior art, the applicant is estopped from arguing the doctrine of equivalents in attempting to prove infringement of a patent by another who is using the means that were abandoned by the amendment. The doctrine of prosecution history estoppel prevents the applicant from recapturing the substance of the claim as originally drafted and subsequently surrendered. *Hughes Aircraft Co. v. U.S.*, 717 F.2d 1351, 1362 (Fed.Cir.1983). In commenting upon the relationship between file wrapper estoppel and the doctrine of equivalents, the court in *Autogiro Company of America v. U.S.*, 384 F.2d 391, 400–01 (Ct.Cl.1967), commented:

> The doctrine of equivalence is subservient to file wrapper estoppel. It may not include within its range anything that would vitiate limitations expressed before the Patent Office. [citations omitted] Thus a patent that has been severe-

ly limited to avoid the prior art will only have a small range between it and the point beyond which it violates file wrapper estoppel. Similarly a patent which is a major departure from the prior art will have a larger range in which equivalence can function.

The estoppel applies to and flows from both claim amendments to overcome rejections based on prior art and to agreements submitted to obtain allowance of the claims. *Hughes Aircraft Co. v. U.S.*, 717 F.2d at 1362.

■■ 22. Defendants argue that file wrapper estoppel applies and plaintiffs are estopped from putting forth that which they gave up during the prosecution of their patent in order to obtain a patent. An examination of the file wrapper reveals that the patent examiner rejected those originally filed claims of the '484 patent which were based on a solely pressure operated relay. Those rejections did not discuss the internal lockout features of the relay. Pravel testified that a review of the file wrapper revealed that the patent examiner granted the patent on the basis of the internal lockin features, not on the basis of a solely pressure operated valve. A fluid pressure operated valve was not a new or inventive concept, but on the contrary, an old and well-known one. The Court finds that Mr. Pravel's position is correct and that file wrapper estoppel does not apply in this situation. *See Hughes Aircraft Co. v. U.S.*, 717 F.2d 1351, 1362–63 (Fed.Cir.1983).

■■■ 23. There is no express statute of limitations period in patent law applicable to an individual's patent infringement claim. The only limitation period involving patent infringement suits merely restricts the period of recovery of damages to six (6) years. 35 U.S.C. § 286. However, laches and estoppel are two equitable defenses that are applied in patent law, their appropriateness being determined under the particular facts of each case. The district judge exercises his discretion in the laches-estoppel decision and his decision will be reversed only if clearly erroneous. Al-

though laches and estoppel both involve delay in filing suit, there is a distinction in their respective effects: successfully asserting the laches defense results in a withholding of damages for any infringement which occurred prior to filing of the suit. Estoppel, on the other hand, forecloses the patentee from enforcing his patent prospectively through an injunction or through damages for continuing infringement. The defense of laches may be invoked where 1) plaintiff has unreasonably and inexcusably delayed in filing suit, and 2) that delay has resulted in material prejudice to defendant. Estoppel requires the two elements of laches, plus action on the plaintiff's part so as to mislead another, and the one mislead has relied upon the action of the inducing party to his prejudice. *Studiengesellschaft Kohle v. Eastman Kodak Co.*, 616 F.2d 1315, 1325–28 (5th Cir.), *cert. denied*, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980). *See also Advanced Hydraulics, Inc. v. Otis Elevator Co.*, 525 F.2d 477, 479 (7th Cir.), *cert. denied*, 423 U.S. 869, 96 S.Ct. 132, 46 L.Ed.2d 99 (1975). If the plaintiff has delayed more than the statutory six year period from the time he became aware of the alleged infringement to the date that suit was filed, the delay is presumed unreasonable and injury to the defendant is presumed (the two elements of laches), and the plaintiff has the burden of proving otherwise. *Leinoff v. Louis Milona & Sons, Inc.*, 726 F.2d 734, 741 (Fed.Cir. 1984); *A.C. Aukerman Co. v. Miller Formless Co., Inc.*, 693 F.2d 697, 699–700 (7th Cir.1982); *Studiengesellschaft Kohle v. Eastman Kodak Co.*, 616 F.2d at 1326. To determine the point at which the delay period commences, the *Studiengesellschaft* Court said that one looks to "the time at which the plaintiff knew or, in the exercise of reasonable diligence, should have known of the defendant's alleged infringing action." 616 F.2d at 1326.

Looking at the requirement of "injury" to the defendant, the *Studiengesellschaft* Court mentions some of the variety of factors that constitute prejudice: important witnesses dead, memories of other witnesses dulled, relevant records destroyed or missing, heavy capital investment by defendant in facilities to expand production. 616 F.2d at 1327. The *Studiengesellschaft* Court notes that factors that will excuse delay are less clear. In the *Studiengesellschaft* case, the court of appeals said "(w)here the plaintiff is engaged in other litigation involving the patent, to escape a defense of laches he must at least inform the potential infringer of his intent to pursue his rights under the patent." 616 F.2d at 1328. In explanation of estoppel, the preclusion of prospective or continuing relief, which requires in addition to the elements of laches, misleading actions on the part of plaintiff, the court of appeals said that plaintiff must have made representations or engaged in conduct which justifies an inference of abandonment of the patent claim or a belief that defendant's business would be unmolested. For silence to be an estoppel, some evidence must exist to show that silence was sufficiently misleading to amount to bad faith. 616 F.2d at 1330.

 24. Plaintiff was aware of the alleged infringement of the Axelson device at the latest in July or August of 1976, when BWB contacted Axelson. Findings of Fact herein # 43, 44. Because plaintiff waited over six years before suit was filed, unreasonable delay and prejudice to the defendants are presumed here. In addition, the Court notes the following factors: investment by Axelson in production facilities for the Type I relay, the death of one of the inventors, the death of defendants' previous patent counsel, no evidence of other litigation pending prior to the institution of this proceeding in 1982, and no evidence that plaintiff informed defendants of their intention to pursue their patent rights when able to do so. BWB contends that they were unable to pursue their patent rights judicially because of insufficient financial resources. Plaintiff has not cited, nor has the Court found, any caselaw which states that financial inability is sufficient to excuse a delay in filing suit. For *pending litigation* to be an excuse for delay in filing, the plaintiff must inform the potential infringer of his intent to pur-

sue his rights under the patent. *Studiengesellschaft Kohle v. Eastman Kodak Co.*, 616 F.2d at 1328. At the very least, even if financial inability were an excuse for delay in filing suit, plaintiff should have communicated such inability to defendants, along with plaintiff's intention to pursue their rights under the patent when able. Some notice should be given defendants. This, plaintiff did not do. The situation here does not warrant excusing the delay in filing suit. The evidence presented is simply not sufficient to rebut the presumption of unreasonable delay and prejudice. Nevertheless, even if these two elements were not presumed, the Court holds that defendants made a sufficient showing as to laches.

■ 25. However, under the circumstances of this case, the Court does not believe that defendants have established estoppel. After fairly regular contact between plaintiff and defendants in the latter part of 1975, 1976, and the first part of 1977, and a brief exchange of correspondence in 1978, plaintiff waited over 3½ years, until 1982, to institute the present proceeding. While there is evidence on which to base a holding of laches, there is no evidence that plaintiff made representations or engaged in conduct which would justify an inference of abandonment by the plaintiff of his infringement claim or a belief that defendants' business could proceed unmolested. The Court thus holds that the defense of estoppel has not been shown.

■ 26. Even though an allegedly infringing device might meet all the literal requirements of a patent claim, it is possible that the doctrine of reverse equivalents might apply, thereby precluding a finding of infringement. The doctrine of reverse equivalents provides that even if there is literal infringement, if the accused device is so far changed from the patented article that it performs the same or similar function, but in a substantially different way, infringement will not be found. *Graver Tank & Manufacturing Co. v. Linde Air Products, Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

27. The U.S. Supreme Court has commented on the doctrine of reverse equivalents:

[E]ven if it be conceded that the Boyden device corresponds with the letter of the Westinghouse claims, that does not settle conclusively the question of infringement. We have repeatedly held that a charge of infringement is sometimes made out, though the letter of the claims be avoided. [citations omitted] The converse is equally true. The patentee may bring the defendant within the letter of his claims, but if the latter has so far changed the principle of the device that the claims of the patent, literally construed, have ceased to represent his actual invention, he is as little subject to be adjudged an infringer as one who has violated the letter of a statute has to be convicted, when he has done nothing in conflict with its spirit and intent. "An infringement," says Mr. Justice Grier in *Burr v. Duryee*, 1 Wall. [68 U.S.] 531, 572 [17 L.Ed. 650 (1863)], "involves substantial identity, whether that identity be described by the terms, 'same principle,' same '*modus operandi*,' or any other."

*Westinghouse v. Boyden Power Brake Co.*, 170 U.S. 537, 568, 18 S.Ct. 707, 722, 42 L.Ed. 1136 (1898). This doctrine has recently been stated more concisely in *Reese v. Eklhart Welding & Boiler Works, Inc.*, 447 F.2d 517, 527 (7th Cir.1971): "More important than a literal application of claim phraseology and similarity of results is the necessity of real identity of means, operation and result."

■ 28. The Court has concluded that the doctrine of reverse equivalents does not apply in this situation. It is evident that the Axelson Type I relay does perform the same function as the BWB patents and in the same way.

■ 29. After reviewing all of the evidence and the applicable law, the Court has concluded that the Axelson Type I relay literally infringes the BWB patent. This conclusion is based on the identity of the claims of the BWB patent and the Axelson

relay and the court room demonstration of the Axelson valve which showed that even without a spring, the Axelson Type I relay had a first pressure surface against which actuator pressure acted, being a force in the closing of the relay. The addition of the spring in the Axelson relay as aid in closing the valve is an addition or embellishment and does not avoid infringement.

30. However, even assuming that the testimony and rationale of David Snyder is correct in his opinion that the Axelson Type I relay does *not* have a first pressure surface, Axelson still cannot avoid infringement.

31. In addition to their argument that the *claims* are limited to a solely pressure operated valve, defendants argue that the *specifications* of the '484 and '050 patents limit the invention to a solely fluid pressure operated valve. Plaintiff responds that the discussion of a fluid pressure operated valve in the specification is simply the "best mode" of the invention. The claims control the invention, plaintiff contends, and the claims do not *exclude* the use of a spring. Furthermore, plaintiff contends that the use of a spring in lieu of fluid pressure is a common substitute.

32. If the Axelson Type I relay does not have a first fluid pressure surface as Mr. Snyder contends, infringement would be made out under the doctrine of equivalents. The testimony at trial showed that substituting a spring or weight for a fluid pressure force was common. Bernard Pravel, plaintiff's patent expert, testified that the Axelson relay was identical in all respects to the BWB patent except for the use of the spring. Because the spring is a very commonly used equivalent to fluid pressure force, defendants cannot avoid infringement by the use of a spring.

33. Defendants argue that plaintiff's patent is not a pioneer patent and is not entitled to any equivalence under the doctrine of equivalents. However, the evidence supports the conclusion that the BWB internal lock relay was a pioneer patent. The old external lockout relay had

been in use for over 13 years before the internal lockout relay was invented. The testimony at trial showed that the internal lockout relay was replacing the external lockout relay in oil and gas safety systems. Nevertheless, even the narrowest range of equivalence, would encompass the substitution of a spring force for fluid pressure force.

34. No evidence was introduced showing that USI manufactured or sold any of the Axelson Type I relays. No evidence was introduced to show that Axelson and USI did not act as separate corporate entities. The Court, therefore, finds no liability for infringement on the part of USI and dismisses plaintiff's claims as against USI.

35. Plaintiff contends that defendant Axelson willfully infringed plaintiff's patents. The evidence showed that David Snyder, a senior designer at Axelson and developer of the Type I relay, was in contact with William C. Brabits, the director/manager of engineering of the Axelson office in Longview, Texas from 1971–1978. Mr. Brabits was in turn in contact with Axelson's patent attorney, Mr. Hyer. The testimony at trial, as well as the correspondence between Snyder and Brabits, and Brabits and Hyer, indicate that these three parties studied the infringement issue and concluded that there was no infringement. The Court accordingly finds that defendant Axelson did not willfully infringe the BWB patents. Plaintiff's Exhibits Nos. 38, 51, 80–82; Defendants' Exhibits Nos. 16–18. *See also* Attachments to Plaintiff's Opposition to Defendants' Motion for Summary Judgment, R. III, Doc. 49.

36. Plaintiff requests that the Court make an award of prejudgment interest herein under 35 U.S.C. § 284. The Court declines to rule on that request at this time. That request is more properly addressed at the trial of the damage portion in this proceeding.

Accordingly,

IT IS THE ORDER OF THE COURT that judgment be entered on the liability phase of this litigation in favor of plaintiff BWB Controls, Inc. and against defendant Axelson, Inc. in accordance with this opinion, holding that the Axelson, Inc. Type I relay infringes the BWB Controls, Inc. patents at issue herein.

IT IS FURTHER THE ORDER OF THE COURT that judgment be entered on the liability phase of this litigation in favor of U.S. Industries, Inc. and against plaintiff BWB Controls, Inc., thereby dismissing plaintiff's claims as against U.S. Industries, Inc.

Plaintiff and defendants are requested to submit a proposed judgment in accordance with the Findings of Fact and Conclusions of Law herein.

## APPENDIX 1

## GLOSSARY OF TERMS

1. *Actuator Valve* (also referred to as a surface safety valve)—Main surface valve positioned at the wellhead for controlling the flow of oil and gas from a well through a pipeline.

2. *Pneumatic Relay Valve* (also referred to as a pilot relay valve, pilot valve, control valve or relay valve)—A normally closed, three-way block and bleed fluid valve installed in the safety system of an oil and gas pipeline, selectively shiftable between open and closed positions. The relay receives a signal from one end (from the pressure sensors) and transmits a signal to the other end (which is connected to the actuator valve), thus controlling the opening or closing of the flow of oil or gas in the pipeline. In the open position the relay allows "supply" fluid to flow through the valve to control the opening of another valve, normally an actuator valve; in the closed position the relay blocks the flow of "supply" fluid to the actuator valve, bleeds the actuator and thus closes the actuator valve, thereby stopping the flow of oil and/or gas in the pipeline. The pilot relay valve is maintained in the open position by a "second" or "pilot" fluid pressure that enters the relay through a port at the bottom of the relay (the pilot port). Upon loss of such second or pilot fluid pressure, the pilot relay valve will shift closed thus bleeding and closing the actuator valve and blocking the flow of the oil or gas through the pipeline. Once in the closed position, government regulations require that the pilot relay valve be manually pulled to the open position to resume supply fluid flow through the relay, to open the actuator valve and thus open the main flowline.

3. *Supply Pressure* (or actuator fluid pressure)—Fluid pressure, normally pneumatic, which flows through the pilot relay valve, when the valve is in the open position, to the actuator valve to maintain the actuator valve in the open position.

4. *Pilot Pressure* (or instrument pressure or control fluid pressure)—A second independently controlled source of fluid pressure entering the pilot relay valve through a port in the bottom or end portion of the relay, that maintains the relay valve in the open position. Loss of pilot pressure will cause the relay valve to shift from the open to the closed position, thereby blocking the flow of "supply" pressure through the valve to the actuator, thus closing the main line flow.

5. *Regulator*—Device which regulates the amount of pressure of the control fluid pressure.

6. *High and Low Pressure Sensors*—Three way block and bleed valves through which instrument or pilot pressure flows, keeping the relay and consequently the actuator valve and the main flowline from the well open. The pressure sensors are connected to the main flowline so that if they detect a high or low pressure in the main flowline, the sensor will shift closed, thereby blocking the flow of instrument pressure through the sensors. There is consequently a loss of instrument pressure at the pilot port of the relay, causing the relay to shift to the closed position, cutting off the supply of actuator pressure to the actuator, and thereby closing the main flowline.

7. *"CRBBM" Valve* —The unpatented relay valve manufactured by Axelson, Inc. since at least as early as 1960 and having an "external lockout" pin for maintaining the valve in the closed position until it is manually reset to the opened position.

8. *"External Lockout" Pin* —An unpatented mechanism on the exterior of a "CRBBM" type pilot relay valve whereby a spring-loaded pin engages the main piston of the relay to lock the relay closed, and which pin, when positioned in a certain manner, must be manually reset to allow the valve to reopen.

9. *Type "BD" Relay* —The original pilot relay valve manufactured by B.W.B. Controls, Inc. incorporating the "external lockout" feature.

10. *Type "H" Relay* —The original valve manufactured by B.W.B. Controls, Inc. under the '484 and '050 patents wherein the "external lockout" mechanism was no longer utilized but replaced by an "internal lockout" feature. The H relay shifted to the closed position without the use of a spring. B.W.B. Controls, Inc. subsequently manufactured a Type E relay and a Type EH relay, both of which have a spring-assisted piston.

11. *Internal Lockout* —The internal structure of a pilot relay valve which provides for a reduced area of the valve piston exposed to pilot fluid pressure when the relay is in the closed position, and a greater surface area of the valve piston exposed to pilot fluid pressure when the relay is in the open position. The force exerted against this reduced area at the bottom of the relay (sometimes referred to herein as the small tip), which area is exposed to pilot fluid pressure in the closed position, is insufficient to overcome the greater force exerted by the actuator fluid against a larger area of the valve piston, thus preventing the relay from shifting open by means of pressure differential. The internal lockout includes 1) a small tip or piston at the bottom end of the relay, which when the relay is closed, fits into sealing engagement with the pilot port, 2) an enlarged bore that is not in sealing engagement with the larger piston located right above the small tip piston, when the relay is in the closed position, and 3) a vent or exhaust port. In the event instrument fluid pressure bleeds around the reduced area or small tip and exposes the entire piston face to pilot pressure, the enlarged bore around the piston allows the fluid to bleed around the piston and through a vent, thus preventing the shifting of the valve to the open position until manually reset.

12. *Elongated Bore* —A continuous bore throughout the valve body of a pilot relay valve.

13. *Valve Member* —The elongated stem with piston on one end which extends through the elongated bore of a pilot relay valve and is shiftable within the valve.

14. *First Fluid Inlet Port* —That port which allows the flow of supply or actuator fluid into the relay valve.

15. *Outlet Port* —That port which allows the flow of supply fluid through and out of the relay valve to the end element, normally the actuator valve.

16. *Second Fluid Inlet Port* —That port at the "butt" or bottom of the valve which allows the flow of pilot or instrument pressure into the valve.

17. *Vent or Exhaust Port* —The port which exhausts or vents either pilot or supply fluid pressure to the atmosphere.

18. *First Enlarged Portion of the Bore* —That portion of the valve bore wherein the piston can sealingly engage the walls of the bore when the internal lockout relay is in the open position.

19. *Second Enlarged Portion of the Bore* —(or the undercut or sometimes referred to simply as the enlarged bore)— That enlarged portion of the bore adjacent the pilot inlet port wherein the larger piston located right above the small tip does not seal against the walls of the bore due to its being enlarged. When the relay is in the closed position, this second enlarged bore allows the pilot fluid to bleed around the piston and out a vent, assuring the valve does not shift to the open position.

APPENDIX 2

## EXPLANATION OF SAFETY SYSTEM

The oil or gas flows from the well through the flowline (color red in the diagram) and on to its destination. The flowline is connected to high and low pressure sensors through a needle valve. The regulator controls the amount of instrument pressure (color green) and actuator pressure (color blue). The instrument pressure comes from the regulator, flows through the high and low pressure sensors and to the bottom or pilot port of the relay valve.

The actuator pressure goes into the relay through the first inlet port and out of the relay through the outlet port, which leads to the actuator valve or surface safety valve (SSV). The SSV controls the opening and closing of the flow oil or gas in the pipeline. The application of instrument pressure at the pilot port keeps the relay valve in the open position, allowing the actuator pressure to flow through the relay, keeping the SSV open and therefore the oil or gas flowing.

In Appendix # 2, a high pressure situation has developed. The high pressure sensor has shifted to the closed position, thus blocking the flow of instrument pressure and opening the outlet of the high pressure sensor to the exhaust port of the high pressure sensor. The line from the outlet of the high pressure sensor to the pilot port of the relay is back-bleeding or emptying through the exhaust port of the high pressure sensor. The absence of instrument pressure at the pilot port causes the relay to shift down into the closed position. The shifting of the stem of the relay, blocks the flow of actuator pressure into the relay, and opens up the outlet of the relay to the exhaust ports of the relay. The line from the outlet of the relay to the SSV is emptying or back-bleeding through the exhaust port of the relay. This consequently causes the SSV to close and shut off the flow of oil or gas from the well.

Appendix #3 shows the diagram of a safety system with the BWB "EH" relay. The relay is in the open position. The pressure in the flowline is within normal range and the oil or gas is flowing.

# APPENDIX 4

In Appendix #4, the Axelson Type 1 relay is in the closed position. The gate valve is shut and the flow of oil or gas is shut off. However, the o ring on the small tip of the piston of the relay is either cut or missing. The instrument pressure that is coming through the pilot port is bleeding around the small tip, through the enlarged bore or undercut, and out the exhaust port to the atmosphere.

## APPENDIX 5

**8WB
TYPE "EH" CONTROL**

FIRST FLUID INLET PORT

BLEED PORT

VENT

PILOT INLET PORT

INSTRUMENT PRESSURE

SUPPLY PRESSURE

ATMOSPHERE

FIRST FLUID INLET PORT

OUTLET PORT

BLEED PORT AND VENT

PILOT INLET PORT

**USI/AXELSON
TYPE I**

OUTLET PORT

---

Appendix # 5 depicts two relays that are connected to a safety system. Both relays are in the closed position. However, the o ring on the small tip of each relay is either broken or missing. Consequently the instrument pressure is coming through the pilot port and bleeding around the small tip and undercut and then vented to the atmosphere through the exhaust port.