**AMICUS, INC.**

v.

**AMERICAN CABLE CO., INC.**

Civ. A. No. 82–4055.

United States District Court,
E.D. Louisiana.

April 17, 1987.

Betty F. Mullin and Sushan, Meyer, Jackson, New Orleans, La., Sidney David and Lerner, David, Littenbert & Samuel Westfield, N.J., for plaintiff.

Harry Hardin, III and Jones, Walker, Waechter, Poitevent, Carrere & Denergre, New Orleans, La., Michael Sutton and Arnold, White & Durkee, Houston, Tex., for defendant.

## OPINION

SEAR, District Judge.

## BACKGROUND

These two consolidated cases came before me for trial on the issue of liability on December 1, 1986. After the conclusion of the trial, I allowed the parties the opportunity to reach an amicable settlement. They have failed to do so.

Civil action number 82–4055 was filed in this district on September 13, 1982 by Frederick A. Lang, then owner of U.S. Letters Patent No. 3,646,748. Lang charged American Cable, Inc. (American) with willful infringement of his patent and sought injunctive relief to prevent further infringement. After a stay of proceedings pending the outcome of related litigation, I issued a preliminary injunction on November 18, 1983, prohibiting American from infringing the patent. On January 23, 1984 a consent judgment was entered that was designed by the parties to prevent future infringement. American then entered into a license agreement with Lang which permitted American to use and sell Lang's patented technology.

One year later, on January 18, 1985, Amicus, Inc. (Amicus), the assignee of Lang's patent,[1] filed a motion seeking to hold American in contempt of the January 23, 1984 consent judgment.

On January 4, 1985 civil action number 85–3109 was filed in the Western District of Louisiana by Pattridge Post Tension, Inc. (Pattridge) and American against Lang and Gregory F. Fields, president of Amicus, Inc. Plaintiffs sought a declaratory judgment that American was not in violation of its license agreement with Lang for its use and sale of similar technology under a license from Pattridge. In addition, American and Pattridge charged Lang and Fields with product disparagement, intentional interference with present and future business relationships and unfair competition. The defendants counterclaimed alleging patent infringement by American. On July 18, 1985 the case was transferred to this district and I ordered it consolidated with civil action 82–4055 on September 10, 1985.

■ At trial the plaintiffs in civil action 85–3109 voluntarily dismissed all claims except their action for declaratory judgment. During the trial I dismissed the contempt motion in civil action 82–4055, because the issue in that motion is identical to the issue tried in civil action 85–3109, that is, wheth-

---

1. During the course of this litigation, Lang assigned his patent to Amicus, Inc. No formal substitution of parties pursuant to Fed.R.Civ. Pro. 25(c) was sought, but the parties made their own informal substitution beginning with record document 74a by inserting Amicus, Inc. into the caption. I have ordered that the substitution of the real party in interest be made pursuant to Fed.R.Civ.Pro. 25(c).

er the technology used and sold by American infringes the Lang patent under the patent law doctrine of equivalents.[2] *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

## THE LANG PATENT

The Lang patent is entitled "Tendons for Prestressed Concrete and Process for Making Such Tendons." Prestressed concrete is concrete that has been reinforced by the application of pressure to it. One method of applying that pressure is "post-tensioning." In that process, cables are laid out in the form into which the concrete is to be poured. After the concrete is poured and has cured, one end of the cable is anchored in place and the other end is mechanically pulled, or "jacked," stretching the cable. The jacked end is then anchored. The tension on the cable compresses the concrete and makes it stronger.

Lang's patent describes both a product for use in post-tensioning and a process for manufacturing the product. Claim one of Lang's patent, the product claim, teaches:

A tendon suitable for posttensioning concrete and for use in other applications comprising a multiple-wire strand incased in a corrosion inhibitor, having greaselike consistency relative to worked penetration,[3] in an amount sufficient to provide a circular incasement around the strand of a diameter at least 2 mils greater than the diameter of the strand, and having a seamless plastic jacket tightly covering said incased strand.

More simply, the Lang product consists of a steel cable coated with a thick layer of grease surrounded by a tightly fitted plastic cover.

Claim six of the patent, the process claim, teaches:

A process for making a tendon suitable for use in posttensioning of concrete and for use in other applications which comprises incasing a multiple-wire strand with a corrosion inhibitor having greaselike consistency, particularly relative to worked penetration and flow characteristics, smoothing and shaping said corrosion inhibitor so as to provide an incasement having a circular surface around the strand, the diameter of the circle being at least 2 mils greater than the diameter of the strand, and melt extruding and shrinking a seamless plastic tubular jacket around said incased strand to provide a tight jacket.

In the Lang process a steel cable passes through a grease applicator that surrounds the cable with a smooth coating of grease. The cable then passes through the center of a circular die from which a molten plastic is extruded as a cylinder. As the cable moves through the die it pulls the plastic down tightly around the layer of grease. The plastic-encased cable then passes into a water bath which cools and hardens the plastic before the finished product is wound onto large spools.

American admitted infringing these claims in civil action 82–4055. After the entry of a consent judgment, American took a license to produce the Lang tendon using the Lang process. On July 10, 1984 American acquired a license from Pattridge to produce a similar product, using a similar process.

## THE PATTRIDGE PROCESS

The Pattridge process is a modification of the Lang process that works in the same

**2.** As American and Pattridge point out, the summary form of a civil contempt proceeding is not appropriate in a case in which substantial issues of patent infringement are raised. *KSM Fastening Systems, Inc. v. H.A. Jones Co.*, 776 F.2d 1522, 1532 (Fed.Cir.1985). A summary procedure, of course, was not used in this case. Although it would have been preferable to have dismissed the contempt proceeding and to have required Lang and/or Amicus to submit a new complaint, the transfer of the suit filed by American and Pattridge from the Western District of Louisiana and its consolidation with civil action

82–4055 ensured that the infringement question would receive full exploration in discovery and at trial. With the consolidation, the contempt motion fell dormant and I dismissed it at trial. In this opinion the parties are referred to in their postures in .85–3109—Pattridge and American as plaintiffs, Lang and Amicus and defendants.

**3.** In the interest of simplicity, the corrosion inhibitor is referred to herein as "grease."

basic way. The sole difference is in the die through which the plastic is extruded. In the Lang process, the opening of the die through which the cable passes is a circle, and the plastic extruded as a cylinder. In the Pattridge process there is an obstruction in the die so that a gap is created in the extruded plastic cylinder.

The Pattridge die also contains a slit or a cut in the shape of an arc immediately next to the obstruction which causes a flap to form in the extruded plastic. This flap is designed to close the gap created by the obstruction. As the plastic leaves the extruder, the flap drops down over the gap. Heat retained in the plastic allows the flap to melt into the plastic and close the gap. This reformed plastic cylinder then passes through rollers which are intended to help form a better seal by applying slight pressure at the point of overlap.

## THE PATTRIDGE PRODUCT

The product created by this process is largely indistinguishable from the product created using the Lang process. In both, a steel cable surrounded by a thick coating of grease is encased in a tight-fitting plastic sheath. The surface of the Lang product is smoother and more regular, but otherwise the products appear to be identical.

The change in the die does, however, create a difference in the products. The product produced by American using the Pattridge process has a slight tendency to split along the flap in the plastic created by the change in the die. This splitting is undesirable because it allows concrete to penetrate the plastic covering and bind to the steel cable, reducing the ability of the cable to transmit the force placed on it when jacked. Consequently, tendons with splits larger than one or two inches long are repaired on the jobsite before being used.

While the splitting does make the American product inferior to the Lang product, the splitting does not create a significant difference in the products. By length, less than one percent of the American product splits. These splits are small and are easily repaired by the users of the product.

Furthermore, the Lang and American products are sold interchangeably by American. When American began selling the product manufactured under license from Pattridge, it did not inform its customers of the change. American simply substituted the new Pattridge-type product for the Lang product at the same price. A customer ordering from American is not informed which type of tendon it will receive.

The products are also used interchangeably. American's customers use the Pattridge-type cable in the same applications as they previously used the Lang product manufactured by American. From the standpoint of the user of the tendons Pattridge's product offers no advantage over the Lang invention.

Pattridge freely admits that his goal in modifying the Lang process was to avoid infringing the Lang patent while still being able to use equipment he had previously used to make the Lang product. He admits the change in the die had no purpose other than to attempt to evade an infringement of the Lang patent.

## THE DOCTRINE OF EQUIVALENTS

Amicus contends that even though American's Pattridge-type product and process may not literally infringe the claims of the Lang patent, the American product and process do infringe the Lang patent under the doctrine of equivalents.

■ The doctrine of equivalents permits a finding of patent infringement even when an accused device does not literally infringe the terms of the patent. To establish infringement under the doctrine, the owner of the patent must show that the accused device performs substantially the same function, in substantially the same manner, to achieve substantially the same results. *Graver Tank*, 339 U.S. at 608, 70 S.Ct. at 856.

What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not

require complete identity for every purpose and in every respect.... Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform.

*Id.* at 609, 70 S.Ct. at 856.

■ The doctrine of equivalents is "[d]esigned to protect a patentee from an infringer who appropriates the invention but avoids the literal language of the claims...." *Martin v. Barber*, 755 F.2d 1564, 1567 (Fed.Cir.1985). Equivalence is measured by comparing the accused device to the claims of the patent, not to the commercial embodiment of the patented product. *Nestier Corp. v. Menasha Corp.- Lewisystems Div.*, 739 F.2d 1576, 1579 (Fed.Cir.1984), *cert. denied*, 470 U.S. 1053, 105 S.Ct. 1756, 84 L.Ed.2d 819 (1985).

■ A pioneer invention, one which represents a major advance over the prior art, is entitled to a broad and liberal application of the doctrine of equivalents. On the other hand, an invention which constitutes only a modest advance over the prior art is given a more restricted range of equivalents. *Thomas & Betts Corp. v. Litton Systems, Inc.*, 720 F.2d 1572, 1580 (Fed.Cir. 1983). Patent claims should be given a range of equivalents narrow enough to distinguish from the prior art and avoid invalidity of the patent. *Id.*

## INFRINGEMENT OF THE PROCESS CLAIM

■ The question of infringement of the process claim begins with an examination of the prior art. The prior art demonstrates that a plastic cover had never been successfully extruded over a multi-wire cable. The surface of a multi-wire cable is irregular therefore plastic extruded directly onto the cable binds tightly to the surface of the cable. Such a product is inadequate for post-tensioning concrete because when the concrete hardens it binds to the plastic, locking the cable inside the plastic in place so that it is largely unable to move. Therefore, the tendon does not transmit the force of the jacking.

Lang avoided this problem by surrounding the cable with a thick layer of grease. The grease stopped the constriction of the plastic, permitting the cable to move freely within the plastic cover. Lang's innovation made it possible for the first time to apply extrusion technology to the manufacture of tendons suitable for post-tensioning concrete. In addition, tendons manufactured in this manner had the advantage of a tight cover which excluded air and moisture from the cable, helping to reduce corrosion.

The extrusion manufacturing process proved much more efficient than other methods of manufacturing post-tensioning cables. Although not revolutionary, the Lang invention was an important advance in the manufacturing art, and the Lang process is entitled to a substantial range of equivalents.

■ Applying the three pronged-test of *Graver Tank* to measure the equivalence of the Lang and American processes, I find that the function of the Lang and American processes is the same. Both manufacture tendons for use in post-tensioning.

I further find that the two processes operate in substantially the same way. The only genuine difference in the processes is the addition to the American process of an obstruction in the extrusion die that has as its sole purpose avoiding literal infringement of the Lang patent. However, claim six of the Lang patent does not teach any particular design for the die to be used in the process. Furthermore, the change did not alter any of the important elements of the manner in which the process performs its function. The American process is still an extrusion process. It still incorporates the application of the thick layer of grease and it does not alter the way in which the plastic coating shrinks down to form a tight cover over the cable.

Finally, I find the American process produces a result, that is, a product, which is substantially the same as the product produced by the Lang process. The Lang and American products are indistinguishable in all important respects. As claim six of the

patent requires, both products are undeniably "suitable for use in posttensioning of concrete." In addition, American's Pattridge-type tendon is used and sold interchangeably with American's Lang product. The Pattridge-type product does split slightly, but this has no significant effect on the performance of the product and does not alter my conclusion that the resulting products are substantially the same.

## INFRINGEMENT OF THE PRODUCT CLAIM

Applying equivalence analysis to the product claim, two prior art tendons merit discussion. One is known as the "push-through" tendon, which is manufactured by pushing a lubricated steel cable through a plastic tube. The other is known as the "cigarette-wrap" tendon, which is made by wrapping a thin strip of plastic around a lubricated cable just as one would roll a cigarette.

The primary advantage of the Lang product over these prior art products is that the plastic cover tightly surrounds the cable and the grease. The covering of the cigarette-wrap and push-through products is loose fitting, and permits gases and moisture to be trapped under the plastic cover. The gases and moisture corrode steel. The Lang product is also superior to the cigarette-wrap product because the cigarette-wrap product becomes unsealed during handling.

■ The product produced by the Lang process is superior to the prior art, but it is not as substantial an advance over the prior art as the process by which the product is manufactured. Hence, the product is entitled to a more narrow range of equivalents. The product patent ought not, however, be limited to its literal terms. The evidence demonstrates that the product described in claim one of the patent represents an advance in post-tensioning tendon technology. The owner of the patent is entitled to protection from those who would unfairly claim the benefit of that advance.

■ Applying the test for equivalence, I find there is no difference whatever between the function of the Lang and American products. Both are used to post-tension concrete. Nor is there any difference in the manner in which the two products work. They operate on precisely the same principle.

The question, then, is whether the products generate the same results. From the standpoint of the customer, the broad term results has two dimensions, how easy the tendon is to handle on the jobsite and how well the tendon transmits force in post-tensioning concrete.

In terms of ability to transmit force, claim one of the patent requires only that the product be "suitable" for post-tensioning concrete. The American product satisfies this requirement. In addition, the Lang and American products are used interchangeably, which is conclusive evidence that the tendons do not differ materially in their ability to transmit force.

The slight tendency of the American product to split has an effect on performance at the jobsite. Splits in the covering which are larger than an inch or two must be repaired. However, the time, effort and expense involved in repairing the American product is minimal and there is no indication that the repairs adversely affect any aspect of the product's performance. In light of the similarities of the products this difference is insignificant.

Accordingly, I find the American process and product both infringe the Lang patent under the equivalents.

## FILE WRAPPER ESTOPPEL

■ The plaintiffs assert that "file wrapper" or "prosecution history" estoppel prevents the defendants from asserting a range of equivalents broad enough to encompass the American product and process. *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 900 (Fed.Cir.), *cert. denied*, 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984). Plaintiffs contend that the fact that the Lang patent describes the plastic covering as "seamless" was used to distinguish the prior art at the time the reissuance of the patent was sought.

Documents prepared in support of Lang's reissue application occasionally urge the uniqueness of the "seamless" quality of the plastic cover on his tendon. However, considering the original patent application in light of the prior art, the use of the term seamless in the patent claims was not a factor in distinguishing the Lang product and process from the prior art.[4] The prior art included two other tendons consisting of multi-strand steel cables with seamless covers, one manufactured by extrusion, the other the push-through tendon previously mentioned. The tendons with the extruded cover, however, lacked the thick layer of grease and as a consequence the plastic tended to bond to the cable, preventing effective force transmission. Those cables were unsuitable for post-tensioning concrete. The push-through product had significant gaps between its seamless covering and the cable, which permitted corrosion. The Lang technology was distinguished from these prior art products by the application of the coating of grease which permitted the use of the extrusion process and which eliminated gaps between the cover and the cable. *See Lang v. VSL Corp.*, 219 U.S.P.Q. (BNA) 625, 628 (E.D. Va.1982).

Furthermore, the decision of the Board of Appeals of the United States Patent and Trademark Office on Lang's reissue application makes clear that seamlessness was of no importance in the prosecution of the patent. The seamless quality of the cover on the Lang tendon is nowhere mentioned in either the Board's original opinion or its opinion on motion for reconsideration. Nor did the seamlessness of the cover play a role in two prior district court decisions upholding the validity of Lang patent. *See Lang v. Prescon Corp.*, 545 F.Supp. 933 (D.Del.1982); *Lang v. VSL Corp.*, 219 U.S. P.Q. (BNA) 625 (E.D.Va.1982).

Finally, plaintiffs' file wrapper estoppel argument presumes that the American product does in fact have a seam. That premise is not free from doubt. In the American process when the plastic flap and the tubular plastic covering for the cable leave the extruder both are molten plastic. The flap immediately comes back into contact with the plastic covering and the plastic fuses together. As plaintiffs' exhibit 12A demonstrates and the testimony of the plaintiffs' expert Mr. Bowers confirms, the flap may fuse "completely" into the cover.[5] This produces an indisputably seamless product. Indeed, the evidence in this case discloses that the American product is for all practical purposes seamless. The amount of splitting that occurs in the American product is truly *de minimis*, on the average approximately one percent or less of the total length.

Accordingly, I hold that the plaintiffs may not claim the protection of the file wrapper estoppel defense.

COLLATERAL ESTOPPEL

Pattridge and American further contend that Amicus is precluded by the decision in *Lang v. Pattridge Post-Tension, Inc.*, 228 U.S.P.Q. (BNA) 256 (W.D.La.1984), from arguing that the technology used by American infringes the Lang patent. In that case Lang sued Pattridge claiming that the Pattridge product and process infringed the Lang patent both literally and under the doctrine of equivalents. Judge Stagg found that the Pattridge technology did not literally infringe the Lang patent and he granted Pattridge's motion for involuntary dismissal on the issue of infringement under the doctrine of equivalents.

Collateral estoppel will apply against a party in a subsequent action if (1) the issue in the subsequent action is identical to the issue decided in the prior action; (2) the

**4.** The court's comments with respect to seamlessness in *Lang v. Pattridge Post-Tension, Inc.*, 228 U.S.P.Q. (BNA) 256, 258 (W.D.La.1984), do not control here. They were made in the context of a discussion of literal infringement and were not necessary to the judgment on that issue. *Cf. Studiengesellschaft Kohle v. Eastman Kodak Co.*, 616 F.2d 1315, 1332–33 (5th Cir.),

*cert. denied*, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980).

**5.** Lang obtained plaintiff's exhibit 12A from Donald Wolsefer, who was at the time General Manager of American. Wolsefer kept this sample of cable on his desk at American and used it to demonstrate the quality of American's products to his customers.

issue was actually litigated in the prior action; (3) resolution of the issue was essential to the final judgment in the prior action; and (4) the party against whom the estoppel is asserted had a full and fair opportunity to litigate the issue in the prior action. *A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 702 (Fed.Cir.1983), *cert. denied*, 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed.2d 171 (1984).

There are two aspects to the requirement that the "issue" in the subsequent action be identical to the issue decided in the prior action. First, the legal issue decided must be the same. That requirement is satisfied in this case—the issue is the application of the doctrine of equivalents. Second, the controlling facts must be identical. *Commissioner v. Sunnen*, 333 U.S. 591, 599–600, 68 S.Ct. 715, 720, 92 L.Ed. 898 (1948).

■■■ The plaintiffs assert that the controlling facts in this case are identical to those in the prior action between Lang and Pattridge because the American process and product are identical to the Pattridge process and product found by Judge Stagg not to infringe under the doctrine of equivalents. The defendants contend that both the product made and the process used by American produce materially better results than the product and process involved in the prior litigation. Therefore, facts controlling the determination of equivalence under *Graver* have changed since the prior trial, and defendants cannot be estopped from arguing infringement by equivalents in this case. I agree.

The plaintiffs cannot demonstrate that the process used by American is identical to that litigated in the prior Pattridge trial. David Pattridge testified that many factors affect the quality of the product produced by his process. The speed at which the cable moves through the extruder, the type of plastic, the temperature of the plastic in the extruder and the amount of grease applied to the cable all affect the degree to which the plastic flap fuses to form the sheath covering the cable. The more com-

plete the fusion, the less susceptible the product is to splitting. If the amount of splitting changes, the "result" for the purposes of the doctrine of equivalents is different.

The same analysis applies to the product claim. Whether the product produces substantially the same result depends in part upon the product's performance in resisting splits. Thus, if the American product contains significantly fewer splits than the Pattridge product, a material fact for purposes of the doctrine of equivalents has changed and collateral estoppel is not applicable.

In his opinion Judge Stagg writes that Pattridge's customers testified that "from ten to twenty percent of Mr. Pattridge's tendons had the [splitting] problem." *Lang*, 228 U.S.P.Q. (BNA) at 259. Later, he suggests that twenty percent of the seams on the Pattridge product were bad. *Id.* From this language one cannot conclude whether Judge Stagg found, as plaintiff suggests, that between ten and twenty percent of the total *number* of cables cut and used on a job contained small splits, or whether he found, as defendant suggests, that between ten and twenty percent of the total *length* of cable produced contained splits. However, considering Judge Stagg's opinion as a whole, it is plain that he considered the splitting of the Pattridge product to be a serious problem.

The amount of splitting was not established with any precision by the evidence in Judge Stagg's case.[6] However, the evidence in this case demonstrates that the American product is greatly superior to the product Pattridge presented to Judge Stagg. After granting American a license, David Pattridge set up American's manufacturing process. In doing so, he made several changes in his original process, all designed to improve the product's resistance to splitting. He reduced the amount of grease used on the cable so that grease was less likely to contaminate the plastic and interfere with the flap's fusing into the

---

**6.** Plaintiff has submitted deposition testimony of witnesses who testified at the prior trial in an effort to clarify the testimony given in that case.

These depositions, taken after the prior trial, are irrelevant. *Cf., Eaton v. Weaver Manufacturing Co.*, 582 F.2d 1250, 1255 (10th Cir.1978).

cover. He changed the tooling on the die, moving the obstruction from the outside piece of the die to the inside piece and increasing the width of the flap. The wider flap holds more heat which helps it to fuse more completely into the plastic cover.

Furthermore, American ran its process at a slower speed than Pattridge did. The slower speed increases the amount of time between the extrusion die and the water bath in which the plastic is cooled, allowing more time for the flap to fuse. American also improved the fusion by using a different kind of plastic than was used by Pattridge.

Pattridge and Pattridge's expert maintained that these changes had no effect on the quality of the American product compared with the Pattridge product that was before Judge Stagg. On the other hand, Lang and Amicus's expert testified that the quality of the American product was dramatically improved over the product involved in the prior litigation. In light of the extensive changes made in the Pattridge process installed at American's plant, all aimed at improving the resistance of the product to splits, I credit the testimony of Lang and Amicus' expert.

The weight of the evidence indicates that both the product manufactured and the process used by American produce results materially superior to those obtained by Pattridge. This change in a controlling fact makes the application of collateral estoppel inappropriate.

Accordingly, I find that American has infringed the Lang patent and is liable to Amicus for such amounts as may be hereafter proved.